**L. William MURRELL, et al. (Plaintiffs) Appellants and Respondents,**

v.

**Emmert WOLFF, Building Commissioner of The City of Ballwin, a Municipal Corporation, James Lantz, Successor Building Commissioner of The City of Ballwin, the City of Ballwin, a Municipal Corporation, (Defendants) Respondents,**

and

**Mayer Land Company, a Corporation, (Defendant) Appellant and Respondent.**

**No. 52128.**

Supreme Court of Missouri, Division No. 1.

Nov. 14, 1966.

Motion for Rehearing or to Transfer to Court En Banc Denied Dec. 12, 1966.

Hyman G. Stein, St. Louis, John J. Mc-Atee, Clayton, Charles Alan Seigel, St. Louis, for plaintiffs-respondents.

Israel Treiman, Shifrin, Treiman, Schermer & Susman, St. Louis, for Mayer Land Co.

HOUSER, Commissioner.

Twelve individuals, owners of single-family dwellings, and the trustees of a subdivision in the City of Ballwin sued the city, its building commissioner and Mayer Land Company to invalidate Zoning Ordinance No. 250, nullify a building permit for the construction by Mayer of a multiple dwelling on a certain tract of land, enjoin the city and building commissioner from issuing building permits for the construction of buildings on the land in question not permitted in an "A" Residential District, enjoin Mayer from erecting any four-family multiple dwellings thereon and to require Mayer to remove therefrom one four-family multiple dwelling already built. Mayer sought to invalidate as to Mayer Ordinance No. 496 prohibiting multiple dwellings in "C" Commercial Districts. The final judgment of the trial court in effect sustained the validity of both ordinances and the building permit. Plaintiffs appealed and Mayer appealed. The loss to Mayer in the event plaintiffs succeed in obtaining the relief demanded would be in excess of $15,000 and therefore this Court has jurisdiction.

The City of Ballwin adopted its first zoning ordinance in 1957. Preliminarily the board of aldermen by ordinance created and appointed a zoning commission pursuant to § 89.070 [1] and thereafter passed

1. All section references are to RSMo 1959, V.A.M.S., unless otherwise noted.

Zoning Ordinance No. 175, establishing four districts: "A" Residential; "B" Residential; "C" Commercial and "D" Light Industrial. The regulations for "A" Residential District authorized the use of buildings, among others, for the purpose of "Dwellings," which term was defined elsewhere as "Any building, or portion thereof, which is designed or used exclusively for residential purposes." The use regulations for "C" Commercial Districts provided for any use of buildings permitted in an "A" Residential District. No provision was made for multiple dwellings in Ordinance No. 175, other than the recognition given multiple dwelllings in the section on "C" Commercial District Regulations, which provided that "When a lot is improved with a single family dwelling, two family dwelling or a multiple dwelling, * * * the intensity of use regulations shall be the same as those required in 'B' Residential District."

Mayer Land Company develops and builds subdivisions and shopping centers. In the fall of 1959 Mayer, through real estate agents and acting through a separate corporation, assembled and took options on approximately 600 acres of land mostly within the city limits of Ballwin for the purpose of developing a total community to consist of two subdivisions for private, single-family dwellings, a group of apartment buildings and a shopping center, with a reservation of space for schools and churches. It was to be centered around the intersection of Clayton Road and Kehrs Mill Road. The subdivision to be named Claymont was to lie southeast and that to be named Mayfair was to lie northwest of the intersection. The shopping center was to occupy approximately 11 acres and was proposed to lie in the northwest quarter of the intersection, facing both roads. Just north of the shopping center the county water tower property was located, and north of the water tower and west of the shopping center, with Kehrs Mill Road as its eastern boundary, another 11-acre tract was to be set aside

for approximately 35 garden-type four-family luxury apartment houses, as a buffer zone between the commercial and residential areas. The 11-acre tract was suitable for apartments but not for single-family residences because of the large water tank nearby and was not good for commercial purposes because the water company property divided it from the shopping center. To build the type of home on the size of lot contemplated it was necessary to rezone the subdivision land from "A" Residential to "B" Residential and to rezone the shopping center land and the 11-acre tract for apartments from "A" Residential to "C" Commercial. Maps were prepared illustrating and demonstrating this project on the total community approach. The various portions of the proposal were laid out geographically. Before filing an application for rezoning Mayer had two or three conferences with the mayor, board of aldermen and city attorney at which the city officials were given to understand that "the entire project was one project, that it was indivisible"; that Mayer had to have a lot production of three to an acre; that a shopping center was necessary for convenience, and an apartment complex was necessary to create a buffer zone between the shopping center and the residential areas. It was explained that it was necessary to rezone the 22 acres commercial, 11 acres of which would be for the shopping center and the other 11 acres for luxury apartments. At the time Mayer approached the city officials his purchasing company did not own but had options to purchase the 600 acres. After the matter was fully explained to the officials Mayer made application for rezoning. As an inducement to the city Mayer by letter agreed that if the rezoning ordinances were passed the city would be paid $100 for each acre of land contained in any approved subdivision plat offered for record, the money to be used for public park purposes. On February 8, 1960 the board of aldermen passed Ordinance No. 249 chang-

ing the classification of part of the land from "A" to "B" Residential and Ordinance No. 250 changing the classification of the 22 acres from "A" Residential to "C" Commercial. Both ordinances recited that due notice of public hearing on the application for change of zoning had been given according to law and ordinance and that a public hearing had been held before the board of aldermen. The petition for change of zoning was not referred to a zoning commission before the passage of these rezoning ordinances. No hearings were held by a zoning commission and no zoning commission made any report to the board, for the reason that there was no active zoning commission in existence on February 8, 1960. Ordinances passed in 1952 and 1957 had created temporary zoning commissions but apparently they ceased to function after the commissioners appointed on those occasions made their reports. In reliance on the rezoning Mayer purchased the lands for "about a million and a half dollars." The 11-acre tract for the apartment house complex was part of a larger tract of 134 acres which cost $345,000. Mayer would not have purchased these lands if the ordinances had failed of passage. After acquiring the acreage Mayer proceeded to build "Claymont" subdivision and the shopping center. The next phase of the plan, before building the "Mayfair" subdivision, called for the commencement of the apartment project on 11 of the 22 acres rezoned "C" Commercial. This envisioned approximately thirty-five apartment houses, each two stories in height, accommodating four families, to be rented at from $175 to $225 per month for each apartment. In the latter part of 1963, when Mayer was preparing to apply for a building permit for the first of the apartment buildings, the mayor informed Herman Mayer that the city during the past year had passed an amendatory zoning ordinance which for the first time established a separate category for multiple dwellings, and advised Mayer to obtain a rezoning of the 11 acres from "C" Commercial to Multiple Dwelling before apply-

ing for the building permit. The mayor referred to Ordinance No. 356, passed December 27, 1962, which provided that in Multiple Dwelling Districts a building could be used for any use permitted in any of the Residential District Regulations. The mayor indicated to Mayer that it would probably be best to obtain this rezoning "to be certain that there would be only apartments built on there"; that it would be just a formality, with probably no opposition. Also on December 27, 1962 Ordinance No. 358 had been enacted, deleting a subsection of Ordinance No. 175 authorizing the use of buildings in "A" Residential Districts for the purpose of "dwellings" and enacting in lieu thereof a new paragraph using the language "Single Family Dwellings." Mayer was further informed that the city had passed another ordinance, amending the comprehensive zoning ordinance, establishing a zoning commission and requiring all applications for rezoning in the future to be referred to the zoning commission for investigation, study and recommendation before action thereon by the board of aldermen. This is Ordinance No. 369, passed May 13, 1963.

In December, 1963 Mayer, acting on the Mayor's suggestion, caused a bill to be introduced to change the zoning of the 11 acres from "C" Commercial to Multiple Dwelling. It was referred to the zoning commission, which held a public hearing. Forty citizens appeared and opposed the plan to change the zoning. The zoning commission recommended to the board of aldermen that the proposal be denied. Its minutes recite that it lacked information as to specific plans and data to substantiate the rezoning and that the proposed rezoning did not "fit into Ballwin's master zoning plan and represents spot zoning." The board of aldermen conducted a public hearing on February 10, 1964. A large number of persons appeared in opposition to the rezoning. Petitions in opposition were presented. Attorneys and others appeared and spoke for and against the proposal. The bill providing for the rezoning failed of

passage by a vote of 4 to 2 and the proposal to change the zoning classification of the 11 acres from "C" Commercial to Multiple Dwelling was denied. Shortly thereafter Mayer filed with the city an application for a permit to build a four-family, two-story dwelling on the 11 acres. The application was referred to the city counselor who rendered a written opinion advising the building commissioner that multiple dwellings legally could be erected on the land in question under the city's zoning ordinances. The permit was issued on March 5, 1964. Mayer began immediately to build, in reliance upon the permit. Within thirty days the 11-acre tract was graded suitably to accommodate the entire complex of apartment buildings, at a cost of $8,000, the foundation was laid, sewage facilities were brought up to the area for service to all of the buildings, the engineering and planning was accomplished and utilities were provided for. This suit was filed April 10, 1964. Service of process was obtained on Mayer shortly thereafter. Mayer continued and completed the construction of the apartment building in December, 1964.

On October 11, 1965 Ordinance No. 496 was enacted, amending the subsection of Ordinance No. 175 dealing with "C" Commercial District Regulations by deleting the provision for any use of buildings permitted in "A" Residential District and enacting a new subsection limiting the uses permitted in commercial districts to certain specified uses which did not include multiple dwelling use. The only type of residence permitted in a "C" Commercial District under the amending ordinance was "Single family dwelling." The amending ordinance also repealed the intensity of use subparagraph in the "C" Commercial provisions of Ordinance No. 175, with its reference to multiple dwellings, and limited it to single family dwellings.

On plaintiffs' appeal the first question is whether Ordinance No. 250 is null and void because enacted without first having been submitted to a zoning commission for study,

public hearing and report pursuant to the requirements of § 89.070, which provides as follows:

"In order to avail itself of the powers conferred by sections 89.010 to 89.140, such legislative body shall appoint a commission, to be known at 'The Zoning Commission,' to recommend the boundaries of the various original districts and appropriate regulations to be enforced therein. Such commission shall make a preliminary report and hold public hearings thereon before submitting its final report and such legislative body shall not hold its public hearings or take action until it has received the final report of such commission. Where a city plan commission already exists, it may be appointed as the zoning commission."

Prior submission of the proposed ordinance to a zoning commission was not a condition to the validity of Ordinance No. 250. Section 89.070 prescribes the procedure to be followed by the legislative body in availing itself *in the first instance* of the zoning powers granted to all cities, towns, and villages; in first establishing zoning in a municipality. It relates only to the *original* zoning ordinance fixing the boundaries of the original districts and prescribing the regulations to be followed therein. Logically the term "original districts" as used in § 89.070 refers to the establishment of zoning districts in areas not previously zoned. State ex rel. Sims v. Eckhardt, Mo. Sup., 322 S.W.2d 903, 907. The language following the words "the various original districts" logically refers to regulations to be recommended for the original districts. Before the original zoning ordinance is enacted § 89.070 requires that the legislative body have the benefit of the zoning commission's final report, which is preceded by a preliminary report and public hearings. It contemplates a subsequent hearing or hearings before the legislative body before the latter acts. This provides the property owner, the public and the municipality a double protection against hasty and ill-conceived action in the establishment of

zoning in a municipality. State ex rel. Kramer v. Schwartz, 336 Mo. 932, 82 S.W. 2d 63, 67 [2].

■ Ordinance No. 250 is not an ordinance prescribing regulations to be enforced in the various original districts, but is a measure designed to change and modify original regulations. Ordinance No. 250 amended a previously enacted general, comprehensive zoning ordinance. Section 89.-070 is not concerned with amendments.

■ Recognizing that times and conditions change, and that provision must be made for change, the General Assembly provided in §§ 89.050 and 89.060 for amending, supplementing, changing, modifying and repealing zoning regulations, restrictions and boundaries. These sections govern the procedure in the case of amendments. They require "a public hearing" and official notice. The hearing contemplated for amendments, modifications and changes is a hearing before the legislative body; not the two-phase hearing procedure required in the enactment of original zoning ordinances. After due notice a public hearing was conducted by the legislative body prior to the enactment of amendatory Ordinance No. 250, as required by § 89.050. That was sufficient compliance with state law.

■ A municipality may create a zoning commission, and may go further than the requirements of the statutes and by ordinance provide that all applications for rezoning or for special permits be referred by its legislative body to its zoning commission for investigation, study and report of its findings and recommendations to the legislative body. There was no zoning commission in existence in 1960, to which the bill which finally became Ordinance No. 250 could have been submitted. Nor was there any ordinance requiring prior submission to a zoning commission. For a period of time, including the year 1960 in which Ordinance No. 250 was passed, all zoning amendments went directly to the board of aldermen for public hearing. On February 8, 1960 there was neither state statute nor city ordinance requiring a zoning commission to take action prior to the time the board of aldermen acted. Ordinance No. 369 was subsequently enacted for that purpose.

Plaintiffs cite three cases in support of their argument that a public hearing before the zoning commission was an indispensable condition to the validity of Ordinance No. 250: State ex rel. Sims v. Eckhardt, Mo. Sup., 322 S.W.2d 903; Wippler v. Hohn, 341 Mo. 780, 110 S.W.2d 409, and State ex rel. Kramer v. Schwartz, 336 Mo. 932, 82 S. W.2d 63. These cases, however, actually support the conclusions we have reached. In Eckhardt the Court recognized that § 89.070 relates to original districts; that the term "original districts" as used in § 89.070 "logically refers to the establishment of districts for zoning purposes in any area not previously zoned"; that by the other provisions of § 89.070 definite limitations were placed on cities "for the exercise of the delegated powers to establish original zoning districts and restrictions * * *," and that the provisions in §§ 89.050 and 89.060 for amendments and changes relate to amendment and changes of existing regulations or restrictions. It is obvious in Schwartz that the Court, in stating that a municipal legislative body cannot pass a valid zoning ordinance as authorized by Enabling Act of 1925 until it has received the final report of the zoning commission, was speaking of the permanent, original, comprehensive zoning ordinance, and not of an amendment thereto. It is equally obvious in Wippler that the Court, in stating that "the requirements of notice and a hearing are mandatory and necessary to the validity of an amending ordinance," was speaking of the notice and hearing by the legislative body as required by then §§ 7262 and 7263, RSMo 1929 (now §§ 89.050 and 89.060) and was not speaking of the hearing required of the zoning commission by then § 7264, RSMo 1929 (now § 89.070).

Ordinance No. 250 is valid. Under its terms the land in question has been in a "C" Commercial District since February 8, 1960.

The next question is whether under the zoning ordinances in effect in the City of Ballwin on March 5, 1964 (the date the building permit was issued) multiple dwellings could lawfully be constructed in "C" Commercial Districts. As we have seen, the use regulations for "C" Commercial Districts as set forth in the original enactment of Ordinance No. 175 provided for any use of buildings permitted in an "A" Residential District. The use regulations for "A" Residential Districts as contained in Ordinance No. 175 as originally enacted provided that buildings therein might be used for the purpose of "Dwellings," which in turn were defined as any building designed or used exclusively for residential purposes. Multiple dwellings are dwellings designed and used exclusively for residential purposes and as such clearly fall within the classifications of buildings permitted in "C" Commercial Districts. That multiple dwellings were within the contemplation of the framers of the ordinance when they wrote the "C" Commercial District Regulations further appears from the fact that multiple family dwellings are specifically mentioned by name in the Intensity of Use provisions of such regulations.

■ Plaintiffs argue against this conclusion on the basis that when Ordinance No. 358 was passed on December 27, 1962 amending the use regulations of Ordinance No. 175 for "A" and "B" Residential Districts by limiting buildings used for residential purposes in such districts to single-family dwellings, the use regulations of Ordinance No. 175 for "C" Commercial Districts were likewise and thereby thus limited. Ordinance No. 358 did not in terms amend the use regulations of Ordinance No. 175 relating to "C" Commercial Districts. Whether the amendment of the "A" and "B" regulations carried with it an automatic amendment of the "C" regulations is a matter of ascertaining the legislative in-

tent. We have determined from a consideration of the ordinance as a whole, both before and after the amendment, and from pertinent legislative history, that it was not the intention of the board of aldermen, by passing Ordinance No. 358, to limit residential use in "C" Commercial Districts to single-family dwellings.

Section V of Ordinance No. 175, which regulates "B" Residential Districts, provides in subsection 2 as follows: "The use regulations are *the same as* those in the 'A' Residential District." (Our emphasis.) Section VI, regulating "C" Commercial Districts, contains the following language which it will be observed is different from § V subsection 2: "A building or premises shall be used only for the following purposes: 1. Any use permitted in the 'A' Residential District. * * * [then follows twenty-five named uses, such as Banks, Hotels, Restaurants, etc.]." Ordinance No. 175 does not make "C" Commercial use regulations *the same as* "A" Residential use regulations. Of signal importance is the fact that the language of § VI par. 2 is permissive but *not restrictive* as to the type of residential uses allowed in "C" Commercial Districts.

Next, an examination of the title to Ordinance No. 358 discloses that it is an ordinance amending Ordinance No. 175 "by limiting the use for dwellings in the 'A' and 'B' residential districts to single family dwellings." It does not purport to limit the use for dwellings in "C" Commercial Districts. The initial and introductory language of the ordinance provides that "WHEREAS, the matter of the change of use of dwellings in the 'A' and 'B' Residential Districts to Single Family Dwellings was referred to the Planning Commission by the Board of Aldermen," but does not recite that the matter of a change of use of dwellings in "C" Commercial Districts was so referred. Section 1 of the ordinance amends Ordinance No. 175 by deleting all of subsection 2 of § IV (the use regulations affecting "A" Residential Districts). The provisions of § VI (the use regulations af-

fecting "C" Commercial Districts) are not mentioned anywhere in the ordinance. They are left unamended and unchanged.

One of the canons of construction appropriately to be employed is that referred to in State ex rel. Dean v. Daues, 321 Mo. 1126, 14 S.W.2d 990, 1002: "* * * [W]here a statute is amended only in part, or as respects only certain isolated and integral sections thereof, and the remaining sections or parts of the statute are allowed and left to stand unamended, unchanged, and apparently unaffected, by the amendatory act or acts, it is presumed that the Legislature intended the unamended and unchanged sections or parts of the original statute to remain operative and effective, as before the enactment of the amendatory act * * *." Before the enactment of Ordinance No. 358, § VI subsection 2 authorized "dwellings" to be constructed in "C" Commercial Districts, under a broad definition which included multiple dwellings. It appears that the board of aldermen intended § VI subsection 2 of Ordinance No. 175 to remain in full force and effect, unchanged by Ordinance No. 358, and that "Dwellings," including multiple dwellings, continued to be authorized uses of land in "C" Commercial Districts.

If in passing Ordinance No. 358 the board of aldermen had intended to prohibit multiple dwellings in "C" Commercial Districts, provision would surely have been made therein for the elimination from Ordinance No. 175 of the reference in subparagraph (d) of subsection 5 of said § VI to multiple dwellings, in the "Intensity of Use" provisions relating to "C" Commercial Districts. Its failure to do so indicates a legislative intention to permit the construction of multiple dwellings in "C" Commercial Districts.

■ Another accepted canon of statutory construction is that permitting an examination of the historical development of the legislation, including changes therein and related statutes (or ordinances). State ex rel. Klein v. Hughes, 351 Mo. 651, 173 S.W.2d 877[3]. This inquiry may extend to a consideration of subsequent legislation on the subject. Donnelly Garment Co. v. Keitel, 354 Mo. 1138, 193 S.W.2d 577[3]; State ex rel. Armontrout v. Smith, 353 Mo. 486, 182 S.W.2d 571; 82 C.J.S. Statutes § 366, fn. 71, p. 810. That the board of aldermen in enacting Ordinance No. 358 did not intend to affect uses permitted in "C" Commercial Districts appears by inference from the fact that the board later enacted an ordinance (No. 496) which specifically deleted the provision in § VI, subsection 2 of Ordinance No. 175 authorizing "Any use permitted in the 'A' Residential District" and limited residential use in commercial districts to "Single family dwelling." Another indication that the board did not earlier intend otherwise also appears by inference from the fact that in subsequently enacted Ordinance No. 496 the words "multiple dwellings" were stricken from said subparagraph (d).

It thus appears that the intention of the board of aldermen in passing Ordinance No. 358 was to amend the use regulations affecting "A" Residential Districts expressly; to amend those affecting "B" Residential Districts by reference, and to leave those affecting "C" Commercial Districts untouched.

■ We conclude that the permit issued by the building commissioner to Mayer Land Company on March 5, 1964, authorizing the building of a multiple dwelling on the land in question, was valid.

The next question is whether Ordinance No. 496 is valid and enforceable as to Mayer. Passed and approved on October 11, 1965, it banned multiple dwellings in "C" Commercial Districts.

Mayer pleaded the elements of estoppel and on this appeal counts on estoppel. Mayer also contends for a vested right to use the 11-acre tract for the construction of multiple dwellings; challenges the ordinance as unreasonable, arbitrary and confiscatory, if applied to the land in question,

and claims that the ordinance is an exercise of legislative power in violation of the zoning statutes and of federal and state constitutional provisions prohibiting the taking of property without due process of law. We rest our decision on the basis of estoppel, and do not reach the constitutional question or whether the ordinance is unreasonable, arbitrary and confiscatory or the question of vested rights.

■ Although equitable estoppel ordinarily is not applicable and as a usual thing cannot be invoked against a city in matters pertaining to the exercise of governmental functions, State ex inf. Shortel ex rel. City of Sikeston v. Missouri Utilities Co., 331 Mo. 337, 53 S.W.2d 394; State ex rel. Dalton ex rel. Stonum v. Reorganized District No. 11, Mo.Sup., 307 S.W.2d 501[6], including matters relating to the enforcement of a change in zoning regulations, 101 C.J.S. Zoning § 89, nevertheless the courts may apply the doctrine in exceptional cases where required by right and justice, City of Sikeston, supra, or to prevent manifest injustice. Fleshner v. Kansas City, 348 Mo. 978, 156 S.W.2d 706; City of Dallas v. Rosenthal, Tex.Civ.App., 239 S.W.2d 636[8]; Texas Co. v. Town of Miami Springs, Fla.Sup., 44 So.2d 808; 101 C.J.S. Zoning § 89. "[E]stoppel against a municipality may be rightly and successfully pleaded under some circumstances, such as reliance upon an honestly-obtained permit, coupled with substantial work or expenditures or irrevocable commitments." Metzenbaum on Zoning, Vol. 1, pp. 172–173.

■ This is an exceptional case in which honesty and fair dealing require that the doctrine of equitable estoppel be applied, in order to prevent manifest injustice. All of the elements of estoppel are present. The board of aldermen was fully informed as to the size, dimension and characteristics of this project; that it was conceived and was to be developed on the total community approach, as an integrated whole, as a single project, and that the construction of 35 multiple dwellings on the 11-acre tract was part and parcel of the unified project. The board had every reason to believe that if it granted the requested rezoning Mayer would act upon the approval of the plans implicit in the passage of the ordinances and change position at great cost. Mayer relied upon the tacit approval of the proposed project given by the board in passing the ordinances making this project possible. Mayer undertook a project which would require considerable time to complete and laid out $1,500,000 for the land. A financial benefit accrued to the city in that Mayer paid a substantial sum to the city on the basis of $100 per acre when the subdivision plats were offered for record. Although the transcript does not show how much Mayer spent in constructing Claymont subdivision and the shopping center these phases of the project necessarily involved expending very large sums of money or incurring very substantial liabilities. After Claymont and the shopping center were substantially completed Mayer commenced the third phase, the building of the apartment house complex. Multiple dwellings were then legally permissible on this 11-acre tract by virtue of the zoning amendment specifically passed for this particular project. Mayer applied for a permit to build the first apartment house and the city building inspector, acting on the advice of the city attorney, issued a permit which, as we have seen, was valid. Acting under the authority of a valid permit Mayer spent $8,000 grading the 11-acre tract, installed a sewer main and by the time this lawsuit was filed substantial construction had taken place and substantial expenditures had been made, including the installation of the foundation, utilities, etc., on the first of the 35 apartment houses. More than $71,000 was spent in completing the first building. There is no question that Mayer intended to complete the construction of the entire apartment complex. It is clear that a serious loss would be imposed on Mayer if required to remove the completed apartment building, and if Ordinance No. 496 is enforced so as to prevent the contemplated use of the 11-acre tract as a part of the uni-

fied plan. The evidence shows this land to be unsuitable for any use other than apartments; that the adjacent water tanks are unsightly and that it would be "practically impossible" to sell single-family dwellings anywhere near the water tank area; that the land is not suitable for commercial uses because isolated and divided from the commercial center. There is no evidence that the 11-acre tract is suitable for any other use of a commercial nature permitted by "C" Commercial regulations, unless perhaps for a gasoline filling station. Ordinance No. 496 was passed six months after this lawsuit was filed and more than five years after Mayer paid $1,500,000 for the land for this integrated project.

 Persons purchasing property in an area classified for certain land uses under a zoning ordinance have a right to rely on the rule that a general classification will not be changed unless required for the public good. 101 C.J.S. Zoning § 89. There is nothing to show that conditions affecting the public welfare changed in any manner between the enactment of Ordinance No. 250 and the passage of Ordinance No. 496.

Under these facts an equitable estoppel arises whereby the city is denied the right to enforce belatedly enacted Ordinance No. 496 against Mayer so as to interfere with the completion of the project as planned and approved.

The claim that the one apartment building already built should be removed is disallowed. This building was completed and was lawfully in use in a "C" Commercial District at the time Ordinance No. 496 was enacted. It is a nonconforming use which under § II par. 27 and § VIII par. 2 of Ordinance No. 175 can be continued although such use does not conform to the provisions of amending Ordinance No. 496.

Accordingly, that part of the judgment upholding the validity of Ordinance No. 250 and the building permit is affirmed; that part of the judgment holding Ordinance No. 496 valid and enforceable as to the 11-acre tract in question is reversed, and the cause is remanded for the entry of a new judgment consistent with the views expressed in this opinion.

WELBORN and HIGGINS, CC., concur.

PER CURIAM:

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

All of the Judges concur.