COALITION TO PRESERVE EDUCATION ON THE WESTSIDE, et al., Appellants,

v.

SCHOOL DISTRICT OF KANSAS CITY, Missouri, et al., Respondents.

No. WD 33320.

Missouri Court of Appeals, Western District.

March 29, 1983.

Michael Duffy (argued), Legal Aid of Western Missouri, Kansas City, for appellants.

Shirley Keeler (argued), Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, for respondents.

Before PRITCHARD, P.J., and MANFORD and NUGENT, JJ.

NUGENT, Judge.

The Coalition to Preserve Education on the Westside (hereinafter Coalition) appeals from the trial court judgment that no valid, binding contract existed between the Coalition and the School District of Kansas City (hereinafter District) to open an experimental school in the West High School building. The Coalition argues that the contract is valid because the operation of the school was a proprietary, non-governmental function; because the Coalition was not granted any discretion over governmental functions; because even if the contract limited the exercise of governmental discretion, the limitation was reasonable; and because the

District is estopped from denying the validity of the contract because it has already received substantial benefit. We affirm the judgment.

The Coalition is an unincorporated association of parents, students and residents of the "westside" of Kansas City, Missouri, organized in July, 1980 for the purpose of advocating improvements in the quality of education in the westside neighborhood. Six individual members represent the association in this action.

Although West High School had, at one time, an enrollment of 700 or 900 students, in 1978 the District stopped operating a high school at that location because, according to Superintendent of Schools, Dr. Wheeler, the cost of operation was disproportionately high, enrollment was too small (167) and insufficient funds were available to operate the high school. After closing the high school program, the District received funding from the federal government for a business management magnet school which it operated in the West High School building. For the next two years, the magnet program failed to live up to expectations, incurring a $3,600 per student cost, or $1,400 above the District's average high school cost. Finally, on August 5, 1980, the school board voted to close the building and relocate the magnet program.

Mr. Don Pecina, chairman of the Coalition, testified that in 1978, he and other area residents became concerned about the high rate of absenteeism at West High School, the high dropout rate, and the failure of westside youths to receive a quality education. The group began conferring with the principal of the school and Dr. Wheeler about these and other problems.

When the building was closed in 1980, the group was highly dissatisfied. It wanted the high school reopened, but it wanted one of higher quality than the previous school, and one over which the community could have control.

Following an unsuccessful attempt by the Coalition to meet with the school board, the group entered and occupied the West High

School building "in the name of the community." The group was ordered to leave but refused to do so. Dr. Wheeler testified that as a result of this occupation, he decided to reach an accommodation with the Coalition. As the occupation continued, he met several times with a committee of westside residents which had drafted a "proposal concept" for a "community-controlled" experimental program. On August 14, 1980, he and his staff reviewed the proposal concept, meeting with Coalition representatives who agreed to substitute "community-sponsored" for the troublesome "community-controlled". That evening, a special meeting of the school board was held at which the proposal concept was unanimously adopted.

The document, as approved, provided that "the Kansas City School Board agrees to develop a community-sponsored experimental high school to be located in the West High School building and to begin operations in the fall of 1981." Also provided for was a West Community School Committee, comprised of nine persons, five of which were to be representatives of the community, to work with the District to "insure operation of the facility in the 1980–81 school year", "participate in the evaluation of the principal and the staff", "raise funds", "recommend budgetary expenditures", "develop curriculum", and "establish methods of communicating with the community and the Kansas City School Board." The committee agreed to present a comprehensive program, including budgets, by January 15, 1981.

Following the approval of the proposal, the Coalition vacated the West High School building, appointed the committee provided for in the document, met with parents, planned curriculum, recruited students, raised funds, interviewed applicants for the principal position, and consulted frequently with the school board. At the recommendation of the committee, the board employed Midwest Research to develop a detailed plan of operation for the proposed experimental program at a cost of $40,000. The plan was adopted on February 19, 1981, with a budget of $390,594.

By June, however, financial difficulties began to put several school programs in jeopardy. On July 21, 1981, the board adopted a motion "that the westside be notified that the District at this time had no plan to open an experimental school as previously planned." Dr. Wheeler later testified that this move was necessitated by uncertainty as to the amount of revenue the District would receive and a need to cut $5,000,000 from the preliminary budget to avoid operating at a deficit. Thirteen other schools were closed at the same time and 450 teachers furloughed. In light of these cutbacks, Dr. Wheeler stated that he could not justify the operation of an experimental program at West High School.

Shortly thereafter, the Coalition again entered the building and began teaching sixty-two students. On September 3, 1981, the District sought injunctive relief, alleging that the Coalition members were trespassing and conducting a private school program in a public school building. On September 15, 1981, the Coalition sought specific performance of the agreement adopted on August 14, 1980. The cases were consolidated. After hearing the evidence, the trial court issued an extensive 33-page memorandum and order making the following findings: (1) a contract existed because it was sufficiently specific, and the necessary elements of offer, acceptance by the District, and consideration (in the form of mutual promises) were present; (2) the Coalition, as an unincorporated association, had the capacity to contract and sue; (3) the contract was not invalidated by duress because the District was not bereft of free will simply because of the pressures of the building occupation; (4) by unconditionally promising to open an experimental school, the school board contractually gave up its right not to open the school, a discretionary governmental function which it had no authority to contract away; (5) the board did not clearly abuse its discretion when it decided that financial circumstances required a closing of the experimental program; and (6) the Coalition had no right to enter West High School and conduct an unauthorized

school and was, therefore, enjoined from such activities.

On appeal, the Coalition challenges only the finding (4) and charges that the trial court's ruling that the contract was void because the District contracted away a governmental function was erroneous because:

(1) The actions of the District were proprietary and not governmental in nature;

(2) The contract was a result of proprietary action, not governmental, because it does not purport to invest the Coalition with discretion over governmental functions;

(3) Even though the contract may have the effect of limiting the future exercise of governmental discretion of the District, it is valid because it was for a specific project, was in the public interest, was for the performance of an act within the District's power to perform, was not a limitation upon the discretionary exercise of police powers, was fair, reasonable, and advantageous to the District, was the result of arms length bargaining and not entered into fraudulently or in bad faith; and

(4) The District is estopped from denying the validity of the contract.

Before proceeding to a discussion of the essential questions on this appeal we must note the gentle remonstration of our brother Manford in his occurrence. He believes that we fail in our responsibility when we decline to address a number of issues raised by the respondent District. His reproofs of this majority opinion reflect a difference of view as to the purpose and function of an appellate judicial opinion.

A discussion of the issues raised by the District is not necessary to the disposition of this appeal because, even if we decided all those issues in favor of the Coalition, the ultimate issue is whether on these facts the school board could legally contract away its discretion. If not, all other issues are moot.

Judicial opinions are meant to resolve legal disputes. Therefore, an appellate court does not decide and should suppress its instructive instincts and not discuss issues which are irrelevant and unimportant to resolution of the legal dispute presented. As Bowen, L.J., wrote in *Cooke v. New River Co.,* (1888) L.R. 38 Ch.D. 56, 70–71:

I am extremely reluctant to decide anything except what is necessary for the special case, because I believe by long experience that judgments come with far more weight and gravity when they come upon points which the Judges are bound to decide, and I believe that obiter dicta, like the proverbial chickens of destiny, come home to roost sooner or later in a very uncomfortable way to the Judges who have uttered them, and are a great source of embarrassment in future cases.

(Quoted in R. Leflar, *Appellate Judicial Opinions,* 1974 at 56.)

Much the same sentiment appears in the decisions of Missouri courts. The venerable Lamm, J., wrote in *West v. Spencer,* 238 Mo. 65, 141 S.W. 586 (1911) (at 587–88 in 141 S.W.):

In deciding cases, it is a very good rule not to decide to-day (in an instant case) what you might better decide to-morrow (in some other case). This rule has a tendency to exclude obiter; it points the distinction between a legal treatise on a general head of the law and a judicial opinion on a concrete case, and it saves trouble to those judges who come after us and are called to decide the question as vital and turning in some appeal.

Moreover, decisions on the respondent's points cannot even be relied upon as alternative grounds for affirmance; they are truly nondecisive issues on this appeal. If anything is dictum, certainly an explication of a non-decisive question is.

■ As to the Coalition's first point that the contract merely obligated the District to perform a proprietary function rather than a governmental one, we must begin by noting that the trial court was troubled not by what the District was obligated to do (i.e. operate a school) but by what it had lost the ability to do, namely, to decide *not* to operate the school. Assuming arguendo

that all of the other functions contained in the agreement (i.e. staffing, funding, budgeting, determining curriculum) are proprietary, the crucial question remains, is the power to decide to close a school[1] purely proprietary rather than governmental? The distinction is of importance because of the general rule cited by the Coalition that a municipal corporation may, by contract, limit exercise of its proprietary functions but not governmental functions.

A precise line between governmental and proprietary functions remains to be drawn in the law but a foray through the myriad attempts to define the terms in various contexts would run us far afield. Looking only to Missouri school district cases, we note that the Supreme Court attempted to clarify the tests involved in *State* ex rel. *Allen v. Barker,* 581 S.W.2d 818, 824 (Mo. 1979) (en banc), by noting that the "underlying test is whether the particular act performed is for the common good of all or whether the act can be performed adequately only by government ...." In *Kansas City v. School Dist. of Kansas City,* 356 Mo. 364, 201 S.W.2d 930, 933 (1947), the Supreme Court referred to a school district's "governmental function of imparting knowledge to the State's youth," and cited the definition of a school district as a "quasi public corporation, 'the arm and instrumentality of the state for one single and noble purpose, viz., to educate the children of the district.'" In *Allen v. Salina Broadcasting, Inc.,* 630 S.W.2d 225, 227 (Mo.App.1982), all functions of a school district not serving this "noble purpose" were said to be proprietary.

Applying these tests, we need only say that we can scarcely imagine a function more critical to the "noble purpose" of "imparting knowledge to the State's youth" "for the common good of all" then deciding whether or not to open a school. If that function—lying at the very heart of the educational process—is ruled proprietary,

what possible function could be considered governmental? This is the very function for which school districts exist—not building buildings or operating playgrounds or even hiring teachers—but deciding where and if schools are needed to educate our children. That is not to say that a district may not be able to contract for advice on this question, but to contract away the power ultimately to decide whether certain educational facilities should remain open to serve the District's children is to give up the most basic function of all. Accordingly, we find that the contract deprived the District of a governmental function, a function which the District was not empowered to contract away, and was not merely proprietary in nature.

■ A careful examination of the Coalition's second point, especially as it is argued in both the reply brief and an invited post-argument letter to this court concerning its interpretation of *Sumpter v. City of Moberly,* 645 S.W.2d 359 (Mo.1982) (en banc), reveals that the Coalition takes the position that even if we hold, as we have, that the District's operation of a school is a governmental (as opposed to a proprietary) function, contracts may legitimately limit governmental functions so long as the limitation is *reasonable.* Only when the limitation is unreasonable, according to the Coalition, is the contract an improper exercise of governmental powers.

Assuming arguendo that the Coalition's statement of the law is correct, the question in this case is, then, whether an agreement which commits the District to opening a school for three years, thereby relieving it of the power to decide to close this school, is unreasonable.

The Coalition contends that a municipal corporation may reasonably bind itself to *establish* a governmental function so long as it does not yield *control* of the function. In support of that position, it cites *City of*

---

1. That the District has the power to close a school is not questioned in this case. *See* Title XI generally and Chapter 162 specifically, Revised Statutes of Missouri, 1978. *See also Corley v. Montgomery,* 226 Mo.App. 795, 46

S.W.2d 283, 289 (1932) ("the power of the ... school district, to establish ward schools carries with it, or necessarily implies, the power to abandon schools no longer required.").

*St. Joseph ex rel. Danaher v. Wilshire,* 47 Mo.App. 125 (1891), and *City of Sikeston v. Sisson,* 363 Mo. 104, 249 S.W.2d 345 (1952) (en banc). Neither case supports the expansive meaning the Coalition suggests. *City of St. Joseph* involved a contract between a builder and a city for construction of a sewer. The validity of the contract was not at issue and, in fact, the court simply found the underlying ordinance invalid because it improperly delegated to the city engineer the power to determine the construction materials. The Supreme Court later analyzed *City of St. Joseph* in *Neill v. Gates,* 152 Mo. 585, 54 S.W. 460, 462 (1899), and commented that "[w]hile the city ... has the power and authority to establish sewers in the city ... the city could not delegate such powers; they being legislative, and implying judgment and discretion, to any person or persons, by contract or otherwise." Even if that particular contract had been held valid, it would have obligated the city only to have a sewer *built,* comparable to a contract by the District to construct a school. *See Rector v. Consolidated School Dist. No. 3 of Platte County,* 58 S.W.2d 785 (Mo.App.1933), finding such a contract enforceable. The city made no unequivocal commitment to *operate* the sewer if conditions later made operation impractical. Similarly, *Sikeston* involved challenges to the city's power to agree that sewerage rates would not be reduced until certain revenue bonds were paid off and that, where service was available, the city would require property owners to connect to the system. A commitment to *operate* the system was not at issue.

We find no Missouri case holding that an unequivocal commitment to operate a governmental function for a specified period of time, depriving the municipal corporation of all discretion to discontinue that function, is reasonable. We cannot agree with the Coalition that we should so hold now. The very

reason frequently given for the rule that a municipal corporation cannot contract away its legislative powers is that it would thereby preclude itself from meeting in a proper way any emergencies that may arise.[2] *Stewart v. City of Springfield,* 350 Mo. 234, 165 S.W.2d 626, 629 (1942) (en banc). Almost by definition, then, any delegation which deprives the municipal corporation of the ability to meet emergencies or certain critical, changed circumstances is unreasonable. This case presents one of those circumstances, namely, the loss of certain funding necessary to the operation of the schools in the District as planned.

In its third point, the Coalition argues that even though the governmental discretion of the District may have been limited, the contract is not void because it was for a specific project, was in the public interest, was for an act within the District's power to perform, did not limit the exercise of police power, was fair, reasonable and advantageous to the District when made, was the result of arm's length bargaining, and was not entered into in bad faith.

According to the Coalition, these are all factors which may be balanced against a finding that a contract touches a governmental function and which permit a conclusion that the contract is valid nevertheless. The Coalition cites numerous cases in which this balancing was weighed in favor of the private contractor.

Even if we assume that all the listed factors exist here, and that in fact a balancing test is appropriate, the Coalition's argument is stymied by the fact that in any balancing, both sides of the scales must be weighed. Here, the contractual limitation on the District's authority to close a school was absolute for three years. As we have discussed above, this complete deprivation of a fundamental function of a school dis-

---

**2.** This rule distinguishes this case from *Morrison Homes Corp. v. City of Pleasanton,* 58 Cal.App.3d 724, 130 Cal.Rptr. 196 (1976), cited by the Coalition and holding that a city could not avoid its contract to provide a residential developer with sewer connections in spite of an order from the regional water board prohibiting additional hook-ups because of sewage treatment problems. Apparently in California, "[t]he onset of materially changed conditions is not a ground for voiding a municipal contract", *Id.* at 202, and the city could commit itself to provide future connections regardless of later events.

trict is a heavy burden indeed. The aggregate of all the other factors on the other side of the scales simply cannot equal it. We salute the Coalition's extensive research effort into this area, but we cannot agree that under these circumstances, a balancing can tip the scales in its favor.

■ Finally, the Coalition argues that the District is estopped from denying the validity of the contract because the Coalition has already performed its obligation, the District has received substantial benefit, the public interest would not be damaged by enforcement, and manifest injustice would occur absent enforcement.

■ Although the doctrine of equitable estoppel was held to apply to municipal corporations acting in governmental capacities in *State* on Inf. *McKittrick v. Missouri Utilities Co.,* 339 Mo. 385, 96 S.W.2d 607, 615–16 (1936), that doctrine was also said to be applied "with great caution." Recognizing that caution, the court in *State* ex rel. *Walmar Inv. Co. v. Mueller,* 512 S.W.2d 180, 184 (Mo.App.1974), stated that "[i]n cases ... involving a governmental body, the doctrine of estoppel is not generally applicable; and if applied, is done so only in exceptional circumstances ... In fact, in the exercise of governmental functions, the doctrine of equitable estoppel cannot usually be invoked against a municipal or public corporation."

More specifically, as stated in *Fleshner v. Kansas City,* 348 Mo. 978, 156 S.W.2d 706, 707 (1941), when the governmental entity has no power to make the contract in question, the doctrine is not applicable.

This point, then, like all the others raised by the Coalition, turns on the straightforward fact that the contract was invalid because of a giving up of a fundamental, governmental power, a contractual flaw which cannot be overcome by post-contract activities by either party.

Moreover, although the doctrine may be applied to prevent manifest injustice, *Murrell v. Wolff,* 408 S.W.2d 842, 851 (Mo.1966), such circumstances are rarely found by our courts in light of the policy that "public

rights should yield only in the face of greater equitable rights possessed by private parties." *State* ex rel. *Letz v. Riley,* 559 S.W.2d 631, 634 (Mo.App.1977). Here, although the Coalition has expended great time and energy in reliance on this contract, the District has determined that the public is better served by an abandonment of the effort and an investment of the money involved in other educational endeavors. Although we recognize the resulting frustration to the Coalition, we cannot as a matter of law label this disappointment a "manifest injustice." The state legislature in the exercise of its constitutional authority has given to the school board and the school board alone the right to make such decisions. *Cf. Sumpter v. City of Moberly, supra* (an agreement adopted pursuant to the Public Sector Labor Law, §§ 105.500–105.530, will not be a binding collective bargaining contract, although the ordinance adopted in approving that agreement governs and is binding until changed by appropriate legislative action).

For the foregoing reasons, the judgment of the trial court is affirmed.

PRITCHARD, P.J., concurs.

MANFORD, J., files separate concurring opinion.

MANFORD, Judge, concurring.

I agree with the result reached by the majority. This concurring opinion is submitted because I feel that the majority opinion has not adequately set forth detailed facts pertaining to the case. In addition and throughout this case, the District has challenged the existence of a valid contract *additional* to its defense that the contract was unenforceable because it limited the District as to its governmental function. The majority has adopted the position not to discuss any matter not directly requisite to the disposition of this appeal. While such a position is often adopted by our courts and in most cases is applicable, there is a twofold reason why an exception should be made in this case.

As noted, the District has continually and in specific detail challenged the existence of necessary elements of a valid contract. The majority totally ignores this matter. It needs to be discussed. Secondly, and more importantly, such discussion is important because of the unique relative position and posture of the parties. This is not a case of two or more private individuals simply involved in litigation over a disputed contract. This case involves a statutory public entity and a privately formed group interacting with that public entity. This court bears a responsibility to thoroughly discuss the entirety of this dispute, not only in response to the conflicting contentions of the parties, but to inform and illustrate for others how our courts would consider like contentions by any others potentially situated as the present parties. The majority has failed in that responsibility.

Before setting forth pertinent factual circumstances of this proceeding, some of which are not offered in the majority, and before considering the points on appeal, the parties need to be identified and certain procedural developments relative to the trial of the issues set forth.

Appellant, Coalition to Preserve Education on the Westside, is an unincorporated association of residents of the "west side" of Kansas City, Missouri. Six individuals were named and continue to represent this association. Appellant is hereinafter referred to as the Coalition.

Respondent is the School District of Kansas City, Missouri, its board members and the district superintendent. Respondent is hereinafter referred to as the District.

At the outset, two separate suits were filed. In one suit, the Coalition sought injunctive relief for the specific enforcement of a contract that the Coalition alleges was entered into by the District with the Coalition. In the second suit, the District, by injunctive relief, sought to restrain and enjoin the Coalition from conducting a private school program in a public school building. Prior to trial, by stipulation between the parties and with approval of the court, the cases were consolidated and it was further agreed that since the facts and circumstances alleged in both cases were similar, the cases could be tried together upon consolidation. It was further agreed that the hearing would be final as to both cases and "that the hearing on a request for permanent injunction in each case will be held this morning ..." The cases were ordered to trial and the District was required to present its evidence first.

The matter was tried to the court. Review is prescribed by Rule 73.01 and as that rule has been interpreted by *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). The judgment will not be set aside unless on appeal it is shown that the judgment is against the weight of the evidence, lacks substantial evidence to support it, or it erroneously declares or applies the law. The record fails to disclose any request by the parties for findings of fact and conclusions of law, but the trial court does set forth its memorandum and order consisting of 32 legal size pages which is exhaustive in its consideration of the factual matters upon the record and legal principles applicable herein.

The record discloses the following pertinent facts:

This controversy centers upon a school facility within the Kansas City School District, referred to as West High School. This facility originated in 1925 as a junior high school. In 1960, the facility provided instruction in grades 7 through 10. This grade level continued until 1968. In 1969 and through 1976, the grade level was changed to 8 through 12. From 1977 through 1979, the grade level was 9 through 12. In the 1977–78 school year, student enrollment was 167 students, with an average daily attendance of 145. In the past history of West High School, student attendance had been as high as 800–900 students. The foregoing grade designations during the years 1960–1980 were the result of grade reorganization by the District. When this grade reorganization occurred and West High School did not offer grades 11 and 12, students attended two other district high schools, private school, or dropped

out. With the decline in enrollment and the determination that the cost per student was excessive, the District decided that it would no longer operate a high school at West, effective in 1978–79.

Meanwhile, the District submitted a federally-approved desegregation plan in 1978–79. As part of this plan, West High School remained open as a business magnet school.[1] The business magnet school was a federally funded program and was designed to draw enrollment from the entire district. This program was operated at West High School during the 1978–79 and 1979–80 school years. During this period, Westport Senior High School and Westport Junior High School provided the regular attendance facilities for students within the geographical region of West High School. Students from the West High School region, as well as from other areas within the district, were entitled to attend the magnet school program, but not required to attend. Experience with the magnet school program revealed that it failed to achieve the projected or anticipated enrollment levels. The average cost per student reached $3,600 for 1978–79, which was $1,400 above the average cost per student for average high school costs throughout the district.

During the summer of 1979, the District considered closing several schools within the District. Among those schools considered was West High School. The District board voted to keep West open for the 1979–80 school year, and requested a status report on West at the end of the first semester of the 1979–1980 school year. In December, 1979, the superintendent provided the board a report which included four options: (a) close West High School; (b) turn Westport Junior High School into a business/management school; (c) re-open West High School as a junior high; or (d) keep West High School open and upgrade its program. In March, 1980, a final report was provided the board. In July, 1980, the board was fur-

nished a limited status report which cited low enrollment, high absenteeism, high per pupil costs, and limited course offerings at West High School. On August 5, 1980, another recommendation was sought from the superintendent by the board. This recommendation was in three parts: (a) continue the program at West High School; (b) close the school; or (c) move the business program to Westport Junior High.

On August 5, 1980, the District board voted 5–3 to close West High School. This vote triggered a series of events, the trial of which leads directly to the issues on this appeal.

On August 7, 1980, leaders of the Coalition, accompanied by a few area residents, proceeded to West High School, bypassed two security guards, entered the building, and proclaimed that they were "taking over the building in the name of the community."

The Coalition made three demands: (a) that West High School be kept open; (b) that state funds be provided to support a campus community school; and (c) the guaranteed safety of all persons involved in the takeover. A spokesman for the Coalition announced that the group was prepared to stay indefinitely and until such time that assurances were given that West High School would be used to educate their children. This same spokesman announced that the Coalition planned to establish its own community school at West, open to anyone in grades 9 through 12, and that the school would continue to be occupied until classes started on September 3, 1980. The District's demands to leave the building were repeatedly rebuffed.

On August 10, 1980, two members of the District's board and the superintendent met with representatives of the Coalition. This group agreed to a public hearing the following day at West High School. This scheduled meeting never materialized because of

---

1. "Magnet School" means a school or education center that offers a special curriculum capable of attracting substantial numbers of students of different racial backgrounds. Business education is included. Federal Register, Vol. 45, # 97, May 16, 1980. Program was consolidated into Block Grant–1981 Omnibus Budget Reconciliation Act of 1981, Title 5. Program terminated September 30, 1982.

concern by the board members concerning liability of conducting a meeting at a facility which the District did not control. The Coalition held the meeting anyway. On August 11, 1980, a group of about 20 persons, in support of their demand for a meeting with the superintendent and the president of the board, staged a sit-in at the District offices.

On August 12, 1980, the superintendent and eight board members appeared at Penn Valley Junior College which was thought to be a neutral site, but the proposed meeting with the Coalition was discontinued upon the Coalition's refusal to abandon West High School and its refusal to attend the meeting. The Coalition then sought the assistance of community leaders who, on behalf of the Coalition, submitted to the superintendent a proposal for a community controlled school. The superintendent and his assistant reviewed the proposal, suggested changes, and then agreed to submit and recommend to the board that the District establish a program pursuant to the proposal. This action was premised upon abandonment of West High School by the Coalition and its supporters.

On August 14, 1980, the proposal was reviewed by the District's legal counsel, who advised the District administration that under state law, the District could not proceed under the proposal, specifically because the District, through its board, could not delegate control of curriculum, the hiring and management of personnel, and the control of the building facility itself to the community. On this same date, a lengthy meeting occurred at a downtown motel which involved the superintendent, a personnel specialist, the District by counsel, and four board members representing the District, a local labor leader, counsel for the Coalition, a city councilman, and a local Neighborhood Alliance representative representing the Coalition. The proposal was considered in detail, and identification of legal limitations on the District were noted. During this meeting, calls were made to West High School, asking if withdrawal from the school would occur if various changes were made in the proposal.

A revision of the proposal was finalized. The occupants of the West High School agreed to withdraw after a board meeting was scheduled and assurances were given that the superintendent would submit the revised proposal to the board. A meeting was scheduled the same evening the superintendent submitted the proposal and West High School was vacated.

At the evening meeting on August 14, 1980, the proposal was submitted as promised, along with the superintendent's recommendation that what was referred to as a "prospectus" be accepted. The superintendent at trial testified that he recommended acceptance of the "prospectus" for the purpose of planning a program for West High School. He testified that by its acceptance, the board would authorize him to "begin action on its provisions". The board meeting lasted some twenty minutes, and the board voted unanimously to accept the superintendent's recommendation. At trial, the superintendent and board members, except for one member, testified that the motivation for voting acceptance of the proposal was to resolve the continuing tense situation caused by the occupation of West High School. In its revised format, the proposal did not include provision for signatories to the proposal, but at the close of the board meeting after the vote, a representative of the Coalition submitted to the board president a copy of the proposal containing signature lines. The Coalition representative had signed the proposal and the board president signed it also. The board did not authorize, by formal vote, the president to sign the proposal, but as observed infra, this contention was addressed and resolved by the trial court.

The proposal, being of such length as to prevent its full recitation herein, provided in the main that a community school would offer an optional educational program for students wishing to attend, the school's direction and focus would be determined by a nine-person committee composed of community members and individuals acclaimed to be prominent in business and educational

matters, and that the committee would plan curriculum and assist in staff hiring. Under the proposal, West High School was to remain open during the 1980–1981 school year for *community* use. The proposal provided for a planning staff not to exceed three persons at a cost not to exceed $75,-000; and that the committee in 1980–1981 was to develop a comprehensive educational program, to seek funding to support special programs, and to submit to the District a budget based upon a projected student enrollment which would approximate the average per-pupil cost of other high schools with funds from the District's operating budget. The proposal declared that the District would provide technical assistance to the Committee. Further, the Committee was to participate in the preparation of job descriptions for staff, review applications, and approve final applicants prior to submission of applications to the District board for its approval. The proposal further contained, "the goals and objectives for a period of three years shall be developed and will involve such measures as drop-out rates, absenteeism rate, academic performance, reenrollment of previous drop-outs, number of students enrolled, vigorous recruitment and other such matters as are naturally agreed upon. The remainder of the proposal expressed the "rationale" of the Coalition and the Committee structure. It is to be noted that the Coalition did not oppose the relocation from West to another school of the magnet business management program.

The following is a chronology of events occurring after the August 14, 1980 meeting.

On August 19, 1980, the assistant superintendent announced that planning would have to be supported by federal, state, and private funding sources as supplemental to District support. On this same date, West and Westport High School attendance areas were consolidated and for the 1980–1981 school year, students at West were assigned to Westport.

On September 25, 1980, the West Community High School Committee was formed to submit a budget and educational program to the District by January, 1981.

On October 2, 1980, the Committee met to discuss the hiring of a consulting firm or alternatively, a three-member staff to assist in the development of the budget and educational program.

On October 3, 1980, the District announced that it would receive a federal grant in the sum of $260,362 to operate the magnet business management center. (West had been closed in August, 1980 because, in part, the District thought the monies to operate the magnet business management center would not be forthcoming).

On October 7, 1980, the Committee heard from qualified persons and organizations interested in providing technical assistance for program development of the community-sponsored experimental school.

On January 11, 1981, the Committee held a meeting at West to present a draft of the plan for the school. This draft or report consisted of seven chapters with an appendix and included: (I) an overview of events leading to the establishment of the school; (II) an outline of curriculum; (III) a discussion of staffing and job descriptions; (IV) a detailed facilities analysis; (V) enrollment and student recruitment; (VI) budget; and (VII) an outline of parent and community involvement.

The District entered into a contract with a local research firm to assist in the development of an educational program, and in February, 1981, a $40,000 report of an educational program accompanied by a tentative budget (formulated by the District) in the sum of $390,000 for West was adopted by the District's board. The Committee, using funds it raised from private sources, commenced student recruitment in the spring of 1981. In June, 1981, the Committee recommended a candidate as principal of West. The candidate refused the position offered.

In July, 1981, formulation of the final budget for the 1981–1982 school year was commenced by the District. It was determined that some five million dollars would

have to be reduced from the original budget draft. In response to this budgetary reduction, the District decided to close thirteen schools, along with the reduction or elimination of other educational programs. The West High School was considered in response to the budget reductions. On July 21, 1981, members of the community demanded a definite decision as to whether West would be opened. On this same date, the District, by a majority vote of its board, voted to cancel implementation of the West School program.

Following the District's action, various persons who were affiliated with the Coalition and the Committee again reoccupied West High School. A spokesman for the group announced that he was operating a school in the building. The record shows that volunteer teachers, only one of whom held a state teaching certificate, were assigned to teach. Students were enrolled (62 in number) and some began attending classes. The District made demand upon the occupants to vacate and when these occupants refused and continued to conduct classes, the District sought their removal by injunctive procedures. The response to this action was the claim by the Coalition and others that the proposal discussed above was in fact a contract that permitted the community sponsored operation of a school in the building. The Coalition filed its action seeking specific performance of the claimed contract.

As noted above, the cases were consolidated and a hearing held on both. The trial court entered an exhaustive memorandum and order in support of its judgment. This appeal followed.

Before discussing the precise points presented by the Coalition on this appeal, it is necessary to briefly summarize the trial court's consideration of the evidence and the issues.

The trial court found and concluded that a contract arose between the District and the Coalition. The court noted that the "proposal" from the Coalition was a bona fide offer. The court further concluded that the unanimously adopted board resolu-

tion approving the proposal constituted an acceptance of the offer. Both parties were requested by the trial court to file trial briefs, and the trial court further noted that the District did not contest the offer/acceptance issue. The trial court gave little credence to the fact that the resolution was not adopted in formal fashion by the board, nor that it was adopted without discussion, nor that the board did not specifically authorize the president of the board to sign the proposal. In addition to the trial testimony, the trial court noted the minutes of the board meeting and from the whole of this evidence, found a binding contract insofar as a bona fide offer and acceptance were concerned. In support, the trial court noted that the issue was disposed of under *Hoevelman v. Reorganized School District R2 of Crawford County,* 452 S.W.2d 298, 302 (Mo.App.1970). This court agrees with the finding of the trial court.

Of course, the Coalition does not challenge this finding. By contrast, the District does, and argues in summary that there was nothing more than a mere proposal submitted by the Coalition which was acted upon unilaterally by the District. The District further contends that there was a failure to comply with § 432.070, RSMo 1978. In light of the evidence in the instant record, the argument of the District on this issue is untenable. As noted, the minutes of the special meeting of the District reveal the president of the board signed the proposal immediately following a unanimous vote by the board to accept the proposal. The president of the board testified that there was never any authorization by the board for him to sign. The trial court correctly concluded that the authorization was evinced by the board's vote to accept, and noted further that the signature was affixed in the presence of the board members.

Proceeding further, the trial court addressed the question of whether there existed the necessary third element of a contract —consideration. The Coalition does not challenge the trial court's finding of sufficient consideration. The District, of course,

challenges this finding. The District contends that the only consideration bargained for was the end of an illegal act, to wit, the illegal occupancy of West High School. The District argues the general rule that sufficient consideration does not arise if it amounts only to a promise to do what a person is already obligated to do and cites *R—Way Furniture Company v. Powers Interiors, Inc.,* 456 S.W.2d 632 (Mo.App.1970). What the District fails to consider, but was noted by the trial court, was the proposal (accepted by the District as noted above) contained promises to perform certain acts, i.e., planning and preparing for the design of the curriculum, operating procedures, and the budget. The trial court was correct in its finding that there was sufficient consideration to support the contract in that "a promise by one party to a contract is sufficient consideration for a promise by the other party." *Mohawk Real Estate Sales, Inc. v. Crecelius,* 424 S.W.2d 86, 91 (Mo.App. 1968). The District's challenge to this finding upon the whole of the evidence is untenable.

The next question addressed by the trial court was whether the Coalition had the capacity to contract and to sue upon the contract. This precise question was laid to rest summarily and correctly by the trial court in reference to the rule announced in *Krall, et al. v. Light, et al.,* 240 Mo.App. 480, 210 S.W.2d 739, 745 (1948), where this court declared, "a contract executed in the name of an association, by a member, was binding on that member, and on other members who authorize or ratified same, as well as on the other contracting party." See also C.J.S. *Associations* § 37, Contracts (1980).

The trial court further noted the evidence revealed that the District was the recipient of the benefits resulting from performance by the Coalition upon its promises contained within the proposal for several months following the execution of the proposal or contract. While unnecessary to the answer to the question, the trial court noted the general rule that a party dealing with an association "who receives from it money or other thing of value, is estopped from denying its [association] to contract." 7 C.J.S. supra at 87.

This general rule of estoppel has been held as not applicable, or stated another way, it cannot be invoked against a public entity relative to the exercise of governmental functions by the public entity. But where justice demands it, estoppel will be held to apply, *Consolidated School Dist. No. 2 of Pike County v. Cooper,* et al., 28 S.W.2d 384, 386 (Mo.App.1930), or to prevent a manifest injustice. *Fleshner v. Kansas City,* 348 Mo. 978, 156 S.W.2d 706, 707 (1941). Reference to the estoppel doctrine is made to resolve any speculation that in some cases, it may be held applicable as against public entities where the entity is performing or is exercising a governmental function. As noted, under the facts and circumstances of the instant case, the question of the applicability of the doctrine herein is not reached, nor is an answer required because it was found, and correctly so, that the Coalition had the capacity to contract. *Krall, supra;* see also Rule 52.10. The evidence upon this record reveals that the Coalition was an unincorporated association, and the individuals who testified on behalf of the Coalition were representatives of the Coalition as a class. These individuals sought to fairly and adequately protect the Coalition and its members. Rule 52.10. The trial court properly concluded that the Coalition had standing to contract and to sue.

The next question addressed by the trial court was whether the contract lacked mutuality of obligation and mutual assent. No challenge is made by the Coalition, but the District contends that the contract did not contain any promises by the Coalition to do anything on its part and hence, there was lacking any mutuality of obligation. In addressing this challenge, the trial court correctly refers to the contract for the simple but absolute answer to the question. As noted above, the contract provided for specific promises by the Coalition to perform specific acts. The evidence reveals that performance upon those promises by the Coalition was undertaken.

In addition, the evidence clearly reveals that the District undertook certain performance in direct relation to some of those promises, i.e., candidates were interviewed (by the Coalition as per its promise to do so) for the job of principal, and the record shows that the District extended a contract offer to a particular candidate. Further, the Coalition advertised for bids for consultants and the District awarded a consultant contract to a local firm. As noted by the trial court, there were other such examples revealed by the evidence which further dispel the District's contention.

It is unquestioned that our courts follow the rule that an agreement or contract must be sufficiently definite in its terms as to enable a court to give it an exact meaning. *Brown v. Childers*, 254 S.W.2d 275 (Mo.App.1953). The contract herein upon the reading thereof is, and as the trial court correctly concluded, sufficiently definite to enable the court to determine the obligation of the parties. There is no ambiguity within the terms of the contract as contended by the District. One guiding principle relative to the determination of alleged ambiguity is, "to consider the interpretation that the parties *by their conduct placed upon it.*" *Matthews v. McVay*, 241 Mo.App. 998, 234 S.W.2d 983, 987 (1950) (emphasis added).

The evidence reveals that for months following the vote of acceptance and the affixing of the signature to the contract, the District both acquiesced and directly participated in the Coalition to do things directly provided for within the contract. There is no merit to the District's contention that the contract lacked mutuality of obligation or assent.

The trial court was faced with yet another question, to wit, was the contract sufficiently specific? With reference to the general rule regarding specificity, which states, "a promise to be consideration for the promise of another must be definite and certain", *Burger v. City of Springfield*, 323 S.W.2d 777, 783 (Mo.1959), the trial court specifically noted (and correctly so) the promise of the District within the written contract which reads, "The Kansas City School Board agrees to develop a community-sponsored experimental high school to be located in the West High School building and to begin operations in the fall of 1981." As noted and at various times above, the Coalition, in turn, was to participate in various functions, i.e., "participate in the evaluation of the principal and staff", develop curriculum, develop a comprehensive educational program, and others. The trial court recognized the disputed contract, as drafted, was not any real work of art, but concluded that the instrument contained details sufficiently specific for the purposes of determining the existence of a breach and if applicable, to afford an appropriate remedy. The trial court correctly observed that indefiniteness does not always render an agreement fatally defective. The trial court observed that both parties herein were shown, by the evidence, to have been pursuing a course of conduct aimed at the opening of an experimental school at West High School in the fall of 1981. Under such facts and circumstances, "indefiniteness can be cured by the subsequent conduct of the parties, and as in this case, once an indefinite promise has been partly or wholly performed, the contract becomes sufficiently clear and binding upon all parties." *Continental Bank and Trust Co., et al. v. American Bonding Co., et al.*, 605 F.2d 1049, 1054 (8th Cir.1979).

In the instant case, as noted, the District's contention that the contract lacked sufficient specificity cannot stand in light of the review of the terms and expressions within the contract because said terms and expressions are definite and certain. *Burger, supra*. In addition, the District, by its actions and as shown by the evidence, is bound by the rule in *Continental Bank, supra.*

In consideration of all the issues and hence the evidence relative thereto, the trial court was likewise faced with the question of whether the contract was invalid because the acceptance by the District was secured by duress and not by the free will of the District. Determination of whether a contract was entered into under duress is,

from the facts and circumstances of any particular case, whether it is determinable if "one party to the transaction [was] prevented from exercising his free will by the threats or wrongful conduct of the other..." *Malloy v. Jones,* 351 Mo. 1211, 175 S.W.2d 776, 779 (1943); *Coleman v. Crescent Insulated Wire and Cable Co.,* 350 Mo. 781, 168 S.W.2d 1060 (1943). The District contends that from the evidence it is clear the contract was entered into (if at all, which the District denies) under duress. The circumstance allegedly the source of the duress was the illegal occupation of West High School by members of the Coalition and others. The District points to the testimony of its board members who all testified that they voted for acceptance of the "proposal" because of the occupation of the building. The trial court, however, noted other evidentiary factors which led to its conclusion that the District was not "bereft of the free exercise" of its free will. *Coleman, supra.*

The court noted that the illegal takeover was during the summer vacation, and the only possible disruption would or could have been to the library services being performed in the building. In addition, the court noted that the alleged takeover was peaceful and there was no evidence of violence toward any person or property. The trial court then, very pointedly and most accurately, discussed the very crux of this entire question. *That is, the District did not enter, nor was there anything which required the District to enter, into a contract which satisfied the demands of the Coalition for the purpose or in order to have the occupants of the building removed.* There is no doubt that the takeover of this public facility by members of the Coalition and others was unlawful and an illegal act. Prosecution for this conduct was possibly available pursuant to § 569.140 or § 569.-150, RSMo 1978. There also might have existed possible additional prosecution pursuant to the ordinances of the City of Kansas City, Missouri. In addition to the above courses of action, the District could have sought ejectment of the occupants by an action in the circuit court. To be sure, the

District pursued this very course regarding the "second takeover" as shown by one of the two actions (now consolidated) giving rise to this appeal. With the above alternatives in mind, the trial court correctly and succinctly summarized the entire matter regarding the claim of duress by the District. It stated:

> "It is inconceivable to this court that the School Board would enter into a contract to open an experimental school at a cost of several hundred thousand dollars, against its will, solely because the members of the School Board and its administrators were afraid of a 'confrontation' with a group of 30 citizens illegally trespassing and occupying a largely unused school building." (emphasis added)

When this record is reviewed in its entirety, including the execution of the contract and the conduct of the District subsequent to the execution of the contract, it clearly refutes the contention of duress that would have rendered this contract invalid. The trial court entered another conclusion with which this court not only agrees, but is deemed by this court to completely reveal the meritlessness of the claim of duress. The trial court concluded:

> "If in fact, the Kansas City School Board approved the Proposal of the Coalition against its better judgment and without believing that an experimental program at West High would be beneficial for the students of the Kansas City School District and the residents and taxpayers of that district because of its fear of the unlawful trespassing going on in the building, then the School Board abdicated its legislative power and function to manage, control and govern the public schools of the District." (emphasis added)

The trial court then correctly concluded that although the District was undoubtedly under great pressure, the District nonetheless still possessed free will to refuse the contract offered by the Coalition. As a further concluding note on this question, the record is clear that the District derived benefits under the contract by the actions taken by the Coalition.

Even if we assume arguendo that the contract was executed by the District under duress, would the District be bound under the contract under a theory of ratification or implied contract?

The general rule is that a public corporation cannot be held liable on a contract, even if it has accepted benefits thereunder on the theory of ratification or implied contract. *Mo. Intern. Inv., Inc. v. City of Pacific,* 545 S.W.2d 684, 685, 686 (Mo.App. 1976). However, this rule was adopted relative to contracts which from their inception, were *void* and not merely *voidable.* Assuming that the District was under duress, that would make the contract *voidable,* not void. There is every justification for a rule that holds a public corporation or public body should be estopped from claiming duress in the execution of a contract in those instances where, over a period of time and considered reasonable as related to the particular facts and circumstances of a given situation, that same public corporation or public body accepts the benefits of the contract or agreement or by any other conduct or omission, ratifies the contract or agreement, provided the agreement sued upon is in all other respects binding upon the public corporation or public body concerning its capacity to contract, that the contract is written, and all other statutory prerequisites have been met. See *Goodyear v. Junior College Dist. of St. Louis,* 540 S.W.2d 621 (Mo.App.1976) and § 432.070, RSMo 1978.

The trial court also addressed the question of whether the District, by virtue of its execution of the contract, attempted to bargain away its discretionary legislative power.

This question has been reserved last for discussion because it not only reveals a change of position by the parties concerning their challenges to the trial court's judgment (i.e., on all of the issues discussed above, the Coalition has agreed with the analysis and conclusions of the trial court whereas the District has challenged each of those conclusions and the attending analysis-now upon this last point the District

concurs with the trial court and the Coalition disagrees), but it brings into focus the errors charged by the Coalition on this appeal. It was necessary to discuss the above issues, first to assure the parties herein that those attending elements had been considered by this court in its review of the issues in this case, plus it prevents the necessity to digress and discuss those attending elements in considering the precise points or errors alleged by the Coalition.

While presented as four separate points, the errors alleged by the Coalition can be properly described as four variations or four separate aspects of a common theme or common point. In summary, the Coalition charges that the judgment of the trial court, which ruled that the contract between the District and the Coalition was void because the District, in its execution of the contract attempted to bargain or contract away its legislative power which is a governmental function, was erroneous because:

(a) The actions of the District were proprietary and not governmental in nature;

(b) The contract was a result of proprietary action, not governmental, because the contract does not purport to invest the Coalition with discretion over governmental functions;

(c) Even though the contract may have the effect of limiting the future exercise of governmental discretion of the District, since the contract is for a specific project, is in the public interest, is for the performance of an act within the District's power to perform, is not a limitation upon the discretionary exercise of police powers, was fair and reasonable, and was advantageous to the District, it was the result of arms length bargaining and not entered into fraudulently or in bad faith; and

(d) The District is estopped from denying the validity of the contract on the basis that the contract limits the exercise of the governmental functions of the District.

The Coalition's contention that the action by the District, in the District's execution of

the contract, was proprietary and not governmental, is not tenable. Public education and the maintaining of our public schools is a power vested in the Missouri General Assembly by our state constitution. Mo. Const. Art. IX, § 1(a). That the legislature is charged by our state constitution with the control and function of our public schools has been determined squarely by our state Supreme Court. *State ex rel. Eagleton v. Van Landuyt,* 359 S.W.2d 773 (Mo. banc 1962).

In order to comply with the constitutional mandate placed upon it by Art. IX, § 1(a), the General Assembly has, as it is empowered to do, passed several statutes designed to both establish and regulate the public school system. Within this statutory framework, the District has been designated an urban school district. Section 162.-471, RSMo 1978.[2] See also § 160.011(14), RSMo 1978, definition section. It has been ruled that the foregoing statutes, as well as others related to boards of education and directors of those boards, grant "broad powers and discretion in the management of school affairs. It is a continuation of the legislative function first vested in the General Assembly." *School District of Kansas City v. Clymer,* 554 S.W.2d 483, 487 (Mo. App.1977) Under this concept of continuation, local school boards act in the capacity of the state's agents in the exercise of their discretion to execute governmental powers. See *School District of Mexico, Mo. v. Maple Grove School District,* 359 S.W.2d 743, 748 (Mo.1962). Further statutory implementation, § 162.471, RSMo 1978, vests in the District the *government* and *control* of the District in its board of nine members. Section 177.131, RSMo 1978 provides the board of the District, subject to sufficient funding being provided, shall establish "an adequate" number of elementary/secondary schools, select and procure suitable locations therefor, and furnish suitable buildings.

Readily observable is the fact that the resolve of this issue rests upon the determination of whether the District, at the time it entered into the contract with the Coalition, was acting within its governmental or its proprietary capacity. There seems to be an endless source of authority which states and restates the principle that a public corporation cannot surrender or abdicate by contract any of its legislative powers. *Stewart v. City of Springfield,* 350 Mo. 234, 165 S.W.2d 626, 629 (Mo. banc 1942). The cases go wanting for a precise definition of the terms *proprietary* and *governmental* and perhaps a precise definition is neither possible nor desirable. In the main, most cases involve tort liability, but as regards the determination of a governmental vs. a proprietary function, they are helpful. For recent pronouncements on this issue, see *Fowler v. Board of Regents, Etc.,* 637 S.W.2d 352, 353 (Mo.App.1982) where construction, maintenance and repair of school buildings was held to be governmental, citing *Rennie v. Belleview School District,* 521 S.W.2d 423 (Mo. banc 1975); *Todd v. Curators of University of Missouri,* 347 Mo. 460, 147 S.W.2d 1063 (1941); and *State ex rel. Allen v. Barker,* 581 S.W.2d 818 (Mo. banc 1979) (*Allen I*) where the state Supreme Court quashed its preliminary writ of prohibition against a local school district. The Supreme Court ruled that the trial court did not lack jurisdiction to dismiss plaintiff's petition against the local school district upon the facts pleaded in the petition. The interesting and applicable language in *Allen I* was quoted and adopted in the final opinion in *Allen v. Salina Broadcasting, Inc.,* 630 S.W.2d 225, 226–27 (Mo.App.1982) (*Allen II*), issued by the Missouri Court of Appeals, Southern District. In *Allen II,* the Court of Appeals reversed the trial court's dismissal of plaintiff's petition against the school district because in the court's opinion, the acts complained of by plaintiff raised a material question of fact as to whether the act complained of (i.e., radio broadcast) was a governmental or proprietary act and as a result, disposition by summary judgment was not permissible. *Allen II* quoted and adopted language from *Allen I* which more than anything, illustrates the dilemma faced by the courts on this score:

**2.** At its origin, the statute provided for a six district board. The statute was amended in 1967, 1977, and 1978 and in its last revision, provides for a nine member board.

" 'A school district is a "public corporation" forming an integral part of the State and constituting that instrumentality of the State utilized by the State in discharging its constitutionally invoked governmental function of imparting knowledge to the States youth.' (citations omitted). *Kansas City v. School District of Kansas City*, 356 Mo. 364, 201 S.W.2d 930, 933 (1947). Because a school district is an arm of the state, the Missouri Supreme Court, in *Rennie v. Belleview School District*, 521 S.W.2d 423 (Mo. banc 1975) refused to 'enter the maze of the "governmental-proprietary" dichotomy' in this area. The Court reaffirmed this position in *Beiser v. Parkway School District*, 589 S.W.2d 277 (Mo. banc 1979)."

*Allen II* noted determination of the question must rest upon the individual facts and circumstances of each case. In addition to each case being determined from its own facts and circumstances, both *Allen* cases reference the existence of school districts as being " ' "for one single and noble purpose, viz., to educate the children of the district." ' " *Allen II* at 227. It was further noted from *Allen I* that "functions of a school district that do not serve this 'noble purpose' are proprietary functions and are not given immunity." *Allen II* at 227.

In answer to the allegation that voluntariness of a school district's actions removes its cloak of immunity and in ruling it did not, our state Supreme Court in *Allen I* cited among others the case of *Krueger v. Board of Education*, 310 Mo. 239, 274 S.W. 811 (1925). While ruling in *Krueger* that operation of a school cafeteria was a governmental function, the court in *Krueger* more importantly declared at 814:

"The power given, is given for a public purpose, and to a governmental agency. It is a means, a facility, which the Legislature conceived might be an aid to efficiency and progress in the schools. The power was given to all boards of education. The exercise of the power was left to the discretion of the respective boards—a discretion to be exercised not in aid of any private interest, but only in the interest of the public. *The exercise of the power of discretion in any city or school district is itself an exercise of governmental power. The actual execution of the thing thus deemed necessary and expedient is not less so.*" (Emphasis added)

It has also been declared that school districts perform only governmental functions. *Beiser v. Parkway School District*, 589 S.W.2d 277, 280 (Mo. banc 1979).

The interesting feature of the instant case is the issue of whether the District's conduct was governmental or proprietary. This issue does not arise under the challenge by the Coalition at the point of inception of the contract, but rather, the challenge was made to the District's refusal to continue under the contract and its order to close West High School. Of necessity, of course, the act of entering the contract must be viewed as well in order to resolve the question of whether the District was acting in a governmental or proprietary role. Neither of the parties can, with any validity, question that the intended purpose of the contract was to establish a school.

Three interim questions must be addressed and answered prior to reaching the ultimate conclusion of whether the District acted in a governmental or proprietary role.

First, does the District have the right or power to establish schools within its district? The answer to this question is obvious from our statutes and case authority, and needs no further discussion.

Does the power to establish schools also grant or provide the power to close schools? This second question has been directly answered by our courts. In *Corley v. Montgomery*, 226 Mo.App. 795, 46 S.W.2d 283, 289 (1932), it was declared, *"The power of the board of a city, town, or consolidated school district, to establish ward schools carries with it, or necessarily implies, the power to abandon schools no longer required."* (emphasis added)

The term "abandon" is construed to mean the same thing as *close* for purposes herein. Thus, at this point, two things are observable: (1) school districts can establish schools

within their districts; and (2) the power to establish includes the power to abandon or close schools within the district. The remaining third question is whether (either or both) the establishment and/or closing of schools is a governmental function.

The rule in *Krueger* that "[t]he exercise of the power of discretion in any city or school district is itself an exercise of governmental power" is first recalled. From that rule, the following is of further enlightenment. In *Velton v. School Dist. of Slater*, 222 Mo.App. 997, 6 S.W.2d 652, 653–54 (1928), it was declared, "The school board has the right to move either the grade or the high school; *it is a discretionary matter with them and so long as that discretion is not abused it cannot be interfered with by the courts.*" (emphasis added) See also *Saunders v. Reorganized School Dist. No. 2 of Osage Cty.*, 520 S.W.2d 29, 35 (Mo.1975), where our state Supreme Court declared that school districts are "*vested with wide discretion in all matters affecting school management.*" (emphasis added) *Clymer* also acknowledges the prohibition upon courts to interfere with the powers and discretion of school districts in the management of school matters unless there is an abuse of that discretion.

It is obvious from the review of the contract under consideration herein that the District agreed, by the terms thereof, that it would open an experimental school at West High School in the fall of 1981. In fact, the Coalition argues and insists that this is an unequivocal and unreserved promise or agreement by the District. While the District contends to the contrary, there is no substance to the District's argument that it did not enter into a contract with the Coalition.

As the trial court properly noted, the unreserved agreement or promise to open an experimental school at West High School in the fall of 1981, of necessity, carried the implication that a school would be opened regardless of whether overall conditions in the district might change, and even if it was collectively deemed inadvisable by the District that the experimental school not be opened. Stated another way, the promise to open the school was expressed and carried with it the implication that all other factors notwithstanding, i.e., economic and/or management conditions, the school would be opened. From this, the trial court correctly extracted the conclusion that the District, by contract, relinquished or gave away "*its discretionary power to abandon or close the experimental school program.*" The District possesses no such authority. *North Kansas City School District v. J.A. Peterson-Renner, Inc.*, 369 S.W.2d 159, 165 (Mo.1963) and *Stewart, supra.* For the most recent discussion on the prohibition against bargaining away legislative powers by municipalities, see *Sumpter, et al. v. City of Moberly*, 645 S.W.2d 359 (Mo. banc 1982).[3]

There is no substance to the idea or contention that since the District had the power to establish schools, *Corley, supra*, it was at the time of the present contract only performing a power, right or function it possessed and hence was bound thereby. Such idea or contention ignores the remaining inherent discretionary power to abandon or close schools, *Corley supra*, which is an integral, although implicative, element of the instant contract by virtue of the District's discretionary, and hence governmental, function or power to do so.

There is no question that the power to open, close, or abandon schools within the district was a discretionary governmental function vested in the District for the purpose of executing the management decisions of the district by our state constitution and supplemented by the various statutory enactments by the General Assembly. By its execution of the contract, the District possessed no right or authority to bargain or contract away its right to exercise this governmental power.

A further review of whether the District abused its discretion in its refusal to open West High School in the fall of 1981 has

---

**3.** See also per curiam on Motion for Rehearing and dissenting opinion issued by the Missouri Supreme Court on February 23, 1983. (# 64014)

been made herein. The District voted to close West High School as an experimental school because of existing financial conditions. It may be recalled above that the District, in the summer of 1981, was faced with closing some 13 schools, along with the reduction of some five million dollars in its budget. From all of the facts and circumstances, it cannot be concluded that the vote to close West High School as an experimental school was an abuse of discretion by the District.

It must be concluded that the actions of the District, in the execution of the contract, were governmental in nature as opposed to proprietary, and hence not binding upon the District.

As to the Coalition's point (1)(b) that the contract was binding against the District because it did not invest in the Coalition any discretion over governmental functions, this contention is without merit. The issue does not turn upon whether the contract extended or invested in the Coalition discretion over governmental functions, but rather, the issue is resolved by the prohibition against the District's attempt to bargain or give away its discretionary and hence governmental power to close or abandon schools.

Under point (1)(c), it is argued that although the contract may have the effect of limiting the future exercise of governmental discretion by the District, the contract, because it is for a specific project, was in the public interest, was within the power of the District to perform, was not a limit upon discretionary exercise of police power, was fair and reasonable, was advantageous to the District, was the result of arm's length bargaining and was not entered into by fraud or in bad faith, is enforceable against the District. Reduced to a simple format, the Coalition argues that because of the nature of the contract and circumstances surrounding its execution, there is an exception created, thus binding the District to the contract.

Once again, attention must focus upon the District's action to close the experimental school at West High School, and by such

action, to close or abandon the school as an experimental school in the fall of 1981. It is to the prohibition against giving or bargaining away the governmental power of the District that courts must turn to resolve the question. Whether the contract was voluntarily and freely entered into, was in the public interest, did not invade the police power of the District (which it did not possess), and all the remaining contentions argued by the Coalition are irrelevant. None of these factors change the rule prohibiting or limiting the District's ability to bargain away its governmental power. There is no exception to this prohibitory rule, no matter how laudable the circumstances surrounding the formation and execution of this contract might have been. Simply put, the prohibitory rule does not permit exceptions because of the alleged meritorious circumstances surrounding the formation and execution of the contract.

Under its final point (1)(d), the Coalition argues that even if the District lacked initial authority, right or power to bargain away its discretionary governmental power, the District is nonetheless bound to the contract because the District is estopped from raising the governmental function defense to the claimed validity of the contract.

The Coalition cites *State v. Missouri Utilities Co.*, 339 Mo. 385, 96 S.W.2d 607, 615–616 (1936), and extracts from that authority the declaration that, "Under the law of this state, as it has existed for many years, the doctrine of estoppel, as thus sketched in rough outline, applies, not only to natural persons and private corporations, but to municipalities as well, and that even though such municipalities are acting in a 'governmental capacity.'" (citations omitted) With this quote, the Coalition would urge adoption of a rule that holds flatly that estoppel works against public entities regardless of whether those entities are functioning in a governmental or proprietary capacity. The court in *State v. Missouri Utilities* did not adopt such a broad rule as urged by the Coalition. It is noted at 616 that the court stated, "It is true that courts,

with just regards to the rights of the public, apply the doctrine to cities and counties with great caution." This court acknowledges that same cautionary approach to school districts. It is also recognized by this court, as pointed out by the Coalition, that estoppel has been invoked against a school district. See *Consolidated School District No. 2 of Pike County v. Cooper, supra.* Careful examination of *Pike* reveals that the court was mindful of a distinguishing feature not present in the instant case. The feature was the controversy was between two classes of the public, i.e., a school district versus the estate of a decedent and another school district.

Perhaps to resolve the issue in the most understandable manner, this court should state the basic rule applicable and then examine the instant case for determination of how the rule applies or does not apply. Authority tells us that the basic or general rule is that "the doctrine of estoppel is not generally applicable; and if applied, is done so only in exceptional circumstances and with great caution." *State ex rel. Walmar Investment Company v. Mueller,* 512 S.W.2d 180, 184 (Mo.App.1974) (citing numerous cases declaring the general rule). To this general rule there have been additional refinements.

It is already noted from *State v. Missouri Utilities* that the doctrine, if applied at all, is done so with great caution. See also *State ex inf. Voights, Etc. v. City of Pleasant Valley,* 453 S.W.2d 700, 706 (Mo.App. 1970) for the proposal that "Estoppels and the facts upon which they are predicated should be closely and critically scanned." (citations omitted) Still further, the courts have declared that a public entity "is not estopped by illegal or unauthorized acts of its officers." *Walmar* at 184 (citations omitted). In addition, it has been declared, "It is true, as appellant urges, that the doctrine of estoppel applies to municipalities as well as to natural persons and private corporations when necessary to prevent a manifest injustice. But as to municipalities it is applied cautiously because of the public interest involved. (citations omitted) Nevertheless, it is a well-recog-

nized rule that the doctrine of estoppel is not applied in cases such as this where the city had no power under any circumstances to make the oral contract in question. 'Vain and futile would Constitution and statutes and charter be if any officer of the state, or of a county, or of a city or other municipality, could follow them only when he saw fit. If by estoppel such salutary provisions, enacted with wise foresight as checks upon extravagance and dishonesty, can be utterly abrogated at will by any officer, such provisions then subserve no purpose * * *.'" *Fleshner v. Kansas City, supra,* at 707. See *Arbyrd Compress Co. v. City of Arbyrd,* 246 S.W.2d 104, 108 (Mo. App.1952) quoting *Fleshner, supra; Collector of Revenue of Jackson County v. Parcels of Land, Etc.,* 362 Mo. 1054, 247 S.W.2d 83, 90 (banc 1952) where doctrine was held inapplicable to creation of Land Trust (case provides good collection of cited authority); and *Twiehaus v. Wright City,* 412 S.W.2d 450, 452 (Mo.1967), citing numerous case authority and declaring, " 'Equitable estoppel is impotent to purge transactions of the fatal infirmity of being in violation of law' ... contracts not conforming to statutory requirements 'are ultra vires the municipality in the primary sense of that term.' Certainly that is true of this contract violating an express constitutional provision. This contract was void ab initio and we hold there can be no equitable estoppel in this case."

This court has concluded, in support of the finding and judgment of the trial court, that the District was without authority to bargain away its discretionary governmental powers. The contract was void from its inception because the District incorrectly and improperly attempted to bargain away this power. The entirety of the issues between the parties, including the claim of estoppel by the Coalition, turns upon that conclusion and not the response, activities, contributions, and all other activities by the Coalition, however meritorious they might have been.

There is nothing upon this record which reveals that the judgment of the trial court

lacked substantial evidence or that said judgment was against the weight of the evidence, or that said judgment erroneously declared or applied the law. *Murphy v. Carron, supra,* and Rule 73.01.