STATE ex rel. Albert J. LETZ, Supervisor, Division of Liquor Control, State of Missouri, Relator,

v.

The Honorable James T. RILEY, Judge of the Circuit Court of Cole County, Missouri, Respondent.

No. KCD 29681.

Missouri Court of Appeals, Kansas City District.

Dec. 5, 1977.

William E. Mounts, Jefferson City, for relator.

James P. Dalton, Jefferson City, Irwin E. Blond, Robert B. Olsen, Kansas City, for respondent.

Before SWOFFORD, P. J., and WASSERSTROM, SHANGLER, PRITCHARD, DIXON, SOMERVILLE and TURNAGE, JJ.

SOMERVILLE, Judge.

This original proceeding in prohibition seeks to prohibit the Honorable James T. Riley, Judge of the Circuit Court of Cole County, Missouri (respondent), from temporarily enjoining Albert J. Letz, Supervisor, Division of Liquor Control, State of Missouri (relator), from enforcing "Liquor Control Regulations 15(k)[1] and 25(II)(c)(1)(g)[2] against . . . games conducted by" The Great Atlantic & Pacific Tea Company, Inc. (A & P), Fleming Foods Company (Fleming), and Wetterau, Incorporated (Wetterau), "and their participating stores." A preliminary rule was issued and the matter now comes up for decision as to whether the rule should be made absolute.

Glendinning Companies of Connecticut, Inc. (Glendinning), Dansico Associates, a Division of Mallory Randall Corporation (Dansico), A & P, Fleming, and Wetterau, as plaintiffs, brought an action in two counts against relator, as defendant, in the Circuit Court of Cole County, Missouri, for declaratory judgment and injunctive relief. In support of the relief sought, plaintiffs therein alleged that Glendinning and Dansico were engaged in promoting and marketing certain "games." played in participating stores of A & P, Fleming and Wetterau holding liquor licenses, and that relator was threatening to institute proceedings to revoke or suspend said licenses on grounds that said "games", "Bingo" and "Gamerama", and the manner in which they were being conducted, violated Liquor Control Regulations 15(k) and 25(II)(c)(1)(g).

The legality of the specific liquor control regulations mentioned is not questioned in the underlying action, merely their applicability to said "games" and the manner in which said "games" are conducted. Respondent is asked in the first count of the underlying petition to declare that said "games" do not violate Liquor Control Regulations 15(k) and 25(II)(c)(1)(g) and in the second count to temporarily enjoin relator from enforcing said regulations against A & P, Wetterau, and Fleming and their participating stores holding liquor licenses.

Certain exhibits attached to the underlying petition, along with certain evidence introduced at the "show cause" hearing held in conjunction with the temporary injunction, disclose the following facts which are deemed highly pertinent. Cash prizes up to $1,000.00 in amounts could be won by those who played the "games". Detailed instructions were promulgated for use by the participating stores in promoting and conducting the "games", which, if strictly followed, purportedly exempted the "games" from being construed as lotteries or being in violation of any of the liquor control regulations. These instructions cautioned that slight deviations from prescribed procedures could destroy the exempt status claimed for the "games". Avoidance of anything which could be con-

---

1. "No *licensee* shall allow upon or about his licensed premises, any gambling of any kind or character whatsoever, in which the one who plays stands to win or lose money, trade checks, prizes, merchandise or property or any *other consideration whatsoever.*

   No licensee shall have any gambling devices upon his licensed premises whereby money, trade checks, prizes, merchandise or property or any other consideration whatsoever may be won or lost."

2. "(1) *Restrictions.* . . . No advertisement of intoxicating liquor or nonintoxicating beer shall contain: . . . (g) Any statement offering any *coupon, premium, prize, rebate,* sales price below cost, or discount as an inducement to purchase intoxicating liquor or nonintoxicating beer."

strued as consideration, and complete disassociation with alcoholic beverages in every respect, were stressed in the instructions.

Concern about the "legal" status of the "games" prior to initiating them in Missouri prompted a representative of Glendinning on December 14, 1976, to write the Attorney General's Office of the State of Missouri and ask for a "No Action Letter"[3] if it was concluded that an abstract version of the "games" submitted did not constitute a prohibited lottery, game, gambling or other activity "under Chapter 563 of the Revised Statutes of Missouri." The Chief Counsel of the Consumer Protection Division of the Attorney General's Office acknowledged Glendinning's request and by letter dated December 29, 1976, replied, in part, as follows: "Based upon the information contained in your letter and my understanding thereof, it is the position of this Division that no action will be taken against any person establishing or advertising such promotions in or from the state of Missouri. Please understand, however, that should other information come to our attention which indicates that this promotion is being conducted differently from the way it is described in your letter and attachments, this Division will re-evaluate its position."

Relator was appointed Supervisor of the Division of Liquor Control on May 17, 1977. At all relevant times prior thereto, an acting supervisor headed the division. According to relator's testimony at the "show cause" hearing in connection with issuance of the temporary injunction, neither he nor his predecessor ever approved of the games for or on behalf of the Division of Liquor Control.

The promoters of the games tried in vain to obtain a "no action" letter or some other type of commitment which would be binding on the Supervisor of Liquor Control and thereby insulate the games from enforcement of the liquor control regulations.

Their failure to do so is evidenced by a letter dated March 21, 1977, from an Assistant Attorney General to Glendinning's representative, which, in part, advised as follows: "Because the enforcement of the liquor statutes and regulations is in the hands of the Acting Supervisor of Liquor Control and his agents, this office cannot issue a 'no action' letter. However, the opinions expressed in this letter have been discussed with the acting Supervisor of Liquor Control and will be used by his office in the enforcement of the rules and regulations." By way of explanation with reference to the last sentence in the quoted matter, the Assistant Attorney General who authored the letter testified at the "show cause" hearing that although the opinions advanced by the Attorney General's office had been discussed with relator's predecessor in office, his predecessor was not bound by them and nothing in the referred to letter should be construed as indicating that relator's predecessor considered himself bound by the opinions advanced by the Attorney General's office. Although correspondence subsequently emanated from the Attorney General's office to those promoting the "games" advising that they "will be deemed not to violate the liquor laws or rules" and indicating that "the Division of Liquor Control has no objection to the utilization of these promotions on licensed premises", there is not a scintilla of evidence that anyone in the Division of Liquor Control issued a "no action" letter to the promoters of the "games" or otherwise irrevocably committed the Supervisor of Liquor Control to a non-enforcement policy regarding the violation of any liquor control regulation. The promoters of the "games" apparently labored under a misapprehension that the Attorney General's office was empowered to officially speak for the Division of Liquor Control.

---

**3.** The only explanation in the record as to what is meant by the term "No Action Letter" is that given by Glendinning's attorney: "A letter in which—this is a term by the way, which Mr. Tettlebaum of the Attorney General's office first used to me, and he used it to describe a letter in which he would say, we have reviewed this material, and we believe it would not be violative of the laws and, therefore, this office would take no action against your client on a contention that it is a violation of the law."

Relator contends respondent exceeded his jurisdiction by temporarily enjoining relator from enforcing Liquor Control Regulations 15(k) and 25(II)(c)(1)(g). In support of this contention relator relies upon the well established rule that an officer of the executive branch of government to whom public duties are confided by law "is not subject to the control of the courts in the exercise of the judgment and discretion which the law reposes in him as a part of his official functions." *Selecman v. Matthews*, 321 Mo. 1047, 1051, 15 S.W.2d 788, 789 (banc 1929). See also: *Louisiana v. McAdoo*, 234 U.S. 627, 34 S.Ct. 938, 58 L.Ed. 1506 (1914); and 42 Am.Jur.2d, Injunctions, § 175, pp. 941, 942. Although conceding such to be the general rule, and further conceding that prohibition lies to curb unauthorized judicial acts which transcend jurisdictional limitations, respondent stoutly maintains that invocation of the doctrine of equitable estoppel, a recognized exception to the general rule previously mentioned, more than adequately justified issuance of the temporary injunction against relator.

■ The doctrine of equitable estoppel has been jealously withheld and only sparingly applied against governmental bodies and public officers acting in their official capacity. *State ex rel. Walmar Investment Co. v. Mueller*, 512 S.W.2d 180, 184 (Mo. App.1974). Its application against governmental bodies and public officers is limited to "exceptional cases where required by right and justice . . . or to prevent manifest injustice." *Murrell v. Wolff*, 408 S.W.2d 842, 851 (Mo.1966). The sustaining theory behind its infrequent application against governmental bodies and public officials is that public rights should yield only in the face of greater equitable rights possessed by private parties. *City of St. Joseph v. St. Joseph Terminal R. Co.*, 268 Mo. 47, 56, 186 S.W. 1080, 1083 (banc 1916).

■ The office of Supervisor of Liquor Control is a highly sensitive and demanding position. A supervisor who fails to perform the duties imposed upon him by the Liquor Control Law (Chapter 311, RSMo 1969), or who violates any of the provisions thereof,

is deemed guilty of a misdemeanor, and, moreover, his failure to faithfully perform his statutory duties subjects him to removal from office by the governor. Section 311.-670, RSMo 1969. One of the most sensitive and demanding statutory duties impressed upon the Supervisor of Liquor Control is that of suspending or revoking the liquor license of any licensee who violates any duly promulgated regulation. Section 311.-660, RSMo 1969. Although an aggrieved licensee may file an application to have an order suspending or revoking his license reviewed in the circuit court, "[t]he filing of such application for review shall not stay enforcement of the supervisor's decision". Section 311.700.2, RSMo 1969. While the matter is pending on review and awaiting a final decision, the circuit court lacks jurisdiction to stay enforcement of the supervisor's order. *State ex rel. Wiggins v. Hall*, 452 S.W.2d 106 (Mo. banc 1970). The genesis for attaching such absolute interim validity to orders of the Supervisor of Liquor Control is lucidly and forcibly explained in *State v. Parker Distilling Co.*, 236 Mo. 219, 139 S.W. 453, 461–468 (banc 1911): "[N]o one has a natural or primary right to manufacture, sell, or refine intoxicating liquors, in any quantity, in this state, but such occupation can only be pursued when the person who desires to engage therein first procures a license from the proper authorities of the state authorizing him to do so. Those authorities also establish the fact that the liquor traffic is not a lawful business, except as authorized by express legislation of the state; that no person has the natural or inherent right to engage therein; that the liquor business does not stand upon the same plane, in the eyes of the law, with other commercial occupations. It is placed under the ban of law, and it is therefore differentiated from all other occupations, and is thereby separated or removed from the natural rights, privileges, and immunities of the citizen. . . . When we bear in mind the foregoing idea that the liquor traffic in this state has no legal rights, save and except those expressly granted by license and the statute under which it is issued, then we can more clearly see that

the state may impose such conditions, burdens, and regulations as it may deem wise and proper, and no one who engages therein has a right to complain thereof."

 Recognizing the existence of jurisdiction in respondent to temporarily enjoin relator from enforcing Liquor Control Regulations 15(k) and 25(II)(c)(1)(g) against A & P, Watterau and Fleming and their participating stores, would, as a practical matter, permit said stores and the purveyors of said "games", as well as other potential violators of the liquor control regulations, to circumvent the law as dictated by Section 311.700, supra, and as explicated in *State ex rel. Wiggins v. Hall,* supra. Respondent argues that commitments made to Glendinning, Dansico, A & P, Fleming, and Wetterau, to place abstract versions of the "games" beyond the pale of enforcement of the liquor control regulations, coupled with substantial expenses incurred by plaintiffs in the underlying action by virtue of their reliance thereon, cries out for invocation of the doctrine of equitable estoppel. Four decisive reasons can be quickly marshaled which effectively devitalize this argument. First, neither relator nor his predecessor made any commitment which would immunize the "games" from enforcement of applicable liquor control regulations. Second, the plane occupied by the liquor business in the eyes of the law refutes any contention that equities attached to the protection of private rights involved outweigh equities attached to the protection of public rights involved. Third, relator is impressed with a legal duty of dealing with realities, not abstractions, and respondent does not suggest that relator or his predecessor was ever asked to desist from enforcing liquor control regulations which were, in fact, violated by reason of the manner in which actual, as opposed to abstract, "games" were promoted and conducted.[4] Fourth, any point of view on the abstract version of the "games" attributed to relator's predecessor by the Attorney General's Office in

its surprisingly solicitous correspondence was neither absolute nor unequivocal, and when said correspondence is read in its entirety it is found to be so laden with cautions and warnings purportedly expressed by relator's predecessor that a finely honed imagination is required to say that it even constituted an expression of opinion, much less a binding commitment. Even as to parties other than governmental bodies or public officials, it is axiomatic that a mere expressionof opinion will not justify invocation of the doctrine of equitable estoppel. *Peerless Supply Co. v. Industrial Plumb. & Heat. Co.,* 460 S.W.2d 651, 667 (Mo.1970).

The preliminary rule in prohibition is made absolute.

All concur.

---

4. In the context of this particular case it is unnecessary to decide whether the abstract version of the "games" constitutes a lottery or some other form of gambling proscribed by Chapter 563, RSMo 1969, and this court expressly refrains from passing judgment thereon, and nothing in this opinion should be construed as doing so.