STATE of Missouri ex rel. IMPERIAL UTILITY CORPORATION (Appellant),

v.

Reinhold W. BORGMANN and Joan M. Borgmann, (Intervenors-Respondents),

and

Public Service Commission of the State of Missouri (Respondents).

No. WD 33820.

Missouri Court of Appeals,
Western District.

May 17, 1983.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied June 28, 1983.

Application for Transfer Sustained Aug. 16, 1983.

Case Retransferred Jan. 31, 1984.

Court of Appeals Opinion Readopted Feb. 6, 1984.

Mark G. Arnold, Husch, Eppenberger, Donohue, Elson & Cornfeld, St. Louis, for appellant.

Mary Ann Garr, Asst. Gen. Counsel, Public Service Com'n of Mo., Jefferson City, for respondents.

Nicholas G. Gasaway, Wegmann, Gasaway, Stewart, Schneider, Dickhaner, Tesreau & Stoll, P.C., Hillsboro, for intervenor.

Before WASSERSTROM, P.J., and TURNAGE and CLARK, JJ.

CLARK, Judge.

Appellant Imperial Utility Corporation was found by order of the Public Service Commission to have violated its tariff in wrongfully terminating sewer service to a shopping center owned by intervenors-respondents Borgmann. On review, the circuit court of Cole County affirmed the Commission order and Imperial appeals. Affirmed.

The facts applicable to the controversy are not in dispute. In 1977, the Howard-Money Construction Co. erected a shopping center in Jefferson County within the area served by Imperial. Sewer service was provided commencing October 1, 1977. Arrangements for that service had been contracted by an agreement dated September 27, 1974 and filed in the office of Recorder of Deeds for the county at that time. The service contract reflected an anticipation that ownership of the center would be transferred to other parties and, to protect Imperial, the contract specified that all obligations under the agreement "are to run with the land." It is apparent that the contracting parties sought by the provisions of the agreement and the filing of the document of record to impose on any purchaser of the center the liability for unsatisfied obligations due Imperial for sewer service and connections.

On May 10, 1979, the center was sold to the Borgmanns. At that time, Imperial was owed $19,625.00 in unpaid connection fees for sewer service. The fees had accumulated, in part, because connection charges for individual shops in the center could not be calculated until the business of each tenant and the amount of sewer discharge was determined upon occupancy. As the various spaces were rented over a period of time, the connection fees were calculated resulting in the aggregate of fees unpaid on the date of the ownership transfer. The amount, however, was not recorded as a supplementary lien statement to the document filed in 1974 nor did Imperial attempt to perfect a lien in any other manner.

After the property transfer, Imperial corresponded with Howard-Money in an attempt to collect the fees and furnished copies of the letters to the Borgmanns. Disconnection of sewer service was threatened and on August 1, 1979, payment not having been received, Imperial dispatched equipment and a crew which dug up the sewer line and terminated service. The following day, payment of the original charges plus a reconnection fee of $3,241.08 was made to Imperial on behalf of Borgmanns and service was restored.

The Borgmanns filed a complaint before the Commission contending that the disconnection of sewer service to the center by Imperial was unlawful because in violation of Imperial's tariff in that Imperial had no authority to charge a subsequent property

owner for fees incurred by a previous owner. The Commission report and order, among other findings, sustained the complaint on the grounds that Imperial violated its tariff in failing to collect the fees from the former owner of the shopping center when those fees became due, and in failing to give 30 days notice to the Borgmanns before terminating service. The substance of the Commission's decision, particularly with reference to the contract between Imperial and Howard-Money, is summarized in the following extract from the Commission report:

"Respondent's tariffs clearly state that the bill for connection fees was to be received before rendering service or in the case of additional fees, such bills should be immediately collected. Respondent cannot look to a new customer for a bill owed by an old customer. Respondent cannot try to modify this result by contract. To do so would allow the tariff to be subject to change by contracts between Respondent and its customers."

In the principal point raised on this appeal, Imperial contends the Commission report to have been in error first, because a determination that fees must be collected immediately after they become due is unworkable and in some cases impossible and second, because Imperial's tariff authorizes a lien upon the real estate in question to secure payment of delinquent charges.

In the context of this case, involving only the question of whether disconnection of service to the Borgmanns was lawful, it is unnecessary to consider whether the Commission was correct in holding Imperial to a requirement for immediate collection of fees. If, as we conclude, there can be no liability upon a subsequent customer for the unpaid account of a former customer, the details of how the charges were accumulated are irrelevant. We do note, however, that the Commission findings on the subject are sustainable only in those circumstances where initial sewer connection at a fixed fee may be deferred until the charge is paid. In other situations, reasonable business practice and the terms of Imperial's

tariff contemplate some period of time for payment of accounts after a billing is rendered. An inflexible requirement for immediate payment is unworkable and unrealistic.

As to the issue of a lien encumbrance following title to the real estate and enabling Imperial to collect charges from subsequent owners, a more complex and far-reaching proposition warrants careful review of the issue. At the outset, it is to be noted that Imperial's tariff does provide for the perfection of such a lien. Rule 4.11 of the tariff authorizes Imperial to record the legal description of property on which sewer charges are more than 30 days delinquent, the names and addresses of the title owners and the amount due. According to the tariff, the amount then becomes a first lien on the property and, presumably, is an obligation ultimately enforceable by foreclosure.

The decision by the Commission which rejected Imperial's lien claim under the recorded service agreement of 1974 was based on a conclusion that the contractual effort to acquire the lien was inconsistent with the tariff which, in the Commission's view, prohibited imposition of liability on subsequent customers for earlier outstanding bills. The plain language of the tariff, however, is otherwise because the opportunity to acquire a lien necessarily would burden subsequent customers with potential liability for charges they did not incur. At least in broad outline, the tariff does purport to authorize a procedure under which Imperial could have acquired rights against the Borgmanns on account of the connection charges owed by Howard-Money.

The parties have not briefed and the Commission did not directly consider whether the tariff provision for recording liens as to unpaid charges was valid nor does Imperial present any viable contention that the recorded 1974 agreement effectively complied with Rule 4.11 of the tariff. Of course, at the time the agreement was filed, the charges had not been incurred, construction of the center being then some three years in the future. No recording

was thereafter made to indicate what charges were due and the correspondence which provided the written notice to the Borgmanns was subsequent to their purchase of the center. At most, the recorded agreement may be contended to have placed the Borgmanns on notice to inquire of Imperial or of the sellers whether charges were outstanding and a subject of a lien claim under the agreement.

■ Although the premise is highly dubious, it is assumed for purposes of the point that the 1974 agreement, filed as it was in the office of recorder of deeds and including a legal description of the property, was facially in compliance with Rule 4.11 of the tariff. Also assumed is a community of identity in charges, that is, connection fees bear the same characteristics as "bills for sewer service," the language of the tariff. With these assumptions, we conclude that Imperial was not entitled to a lien or to the remedy of disconnection either by reason of the 1974 agreement or pursuant to the tariff because there is no statutory authority in Missouri enabling a utility to charge subsequent customers for the unpaid bills of previous customers.

Consideration of the subject commences with the following general statement found in 64 *Am.Jur.2d Public Utilities* § 67 (1972):

"The courts have frequently recognized the general rule that in the absence of a statute expressly authorizing shutoff, or making arrearages in service charges a lien on the land on which the service has been used, a public service company or municipal corporation furnishing such service has no right to cut off the service to the premises until the arrears due from the former owner or occupant are paid—in other words, that no right exists to cut off the service to compel payment of a bill which it is not the duty of the consumer to pay."

Independent research has disclosed only one Missouri decision touching this question and the opinion, while informative, is not au-

thoritative because the appeal was dismissed for failure of appellants' brief to comply with the rules. In the case, *Yates v. White River Valley Electric Co-Operative,* 414 S.W.2d 808 (Mo.App.1967), the plaintiffs had brought suit for injunction and damages claiming their electric service had been disconnected because of unpaid charges by a former tenant. In commenting as to the law on the subject, the court stated:

"It seems well established that, subject to certain exceptions, a public utility company may adopt and enforce, as a reasonable regulation for the conduct of its business, a rule that service will be discontinued because of default in payment. However, in the absence of statutory or contractual authority, the company ordinarily has no right to cut off a customer's supply of gas or electricity for non-payment of arrears due from another occupant or owner."

Authorities from other states are in accord with the statement of principle that service disconnection and lien rights for enforcement of charges incurred by others can be invoked by utilities only where sanctioned by statute.[1] Thus, in *Oliver v. Hyle,* 14 Or.App. 302, 513 P.2d 806 (1973), plaintiffs who were month to month tenants refused to pay water and sewer charges for service to prior tenants, and sought an injunction to prevent the utility from terminating service. The utility relied on a city ordinance which held subsequent occupants or owners liable for past arrearages. The court held the ordinance invalid because there was no statutory authority in Oregon granting lien or service termination rights on account of prior utility service charges not contracted by the current owner/occupant/customer.

In *Moore v. Metropolitan Utilities Co.,* 477 P.2d 692 (Okl.1970), plaintiffs were also tenants threatened with disconnection of utility service because of the unpaid account of a former tenant. They paid the bill under protest and brought suit for re-

---

1. This opinion does not consider and the facts of the case do not include a real estate lien acquired by judgment.

fund. Ordering the refund made, the court stated: "In our opinion, the proper rule and the one followed, as noted above, in a majority of jurisdictions, provides that absent some legislative authority, a public utility cannot make a tenant responsible for charges incurred by a prior tenant." To like effect is the decision in *McMenamin v. Evesham Municipal Utilities Auth.*, 104 N.J. Super. 161, 249 A.2d 21, aff'd, 107 N.J.Super. 42, 256 A.2d 801 (1969).

■ There is no statute in Missouri authorizing a public utility to collect charges for service rendered to a previous customer by threat of disconnecting service to the current customer or by imposing a lien on the real estate. Provisions in Imperial's tariff, including Rule 4.11, which purport to sanction such collection remedies are therefore invalid. If, as we have assumed, the 1974 service contract was filed and is now sought to be enforced under the aegis of Rule 4.11, the claim to a lien and the right to disconnect service fails and Imperial must look only to Borgmann's vendor for payment.

As we noted earlier, the assumption that the 1974 contract complied with Rule 4.11 is tenuous. Thus, there remains the question of whether the contract, providing as it did a recorded lien, may yet be operative to invest Imperial with rights against the Borgmanns. Imperial seems to argue that it does if no tariff provision conflicts. By our conclusion that the tariff cannot grant lien or disconnection rights against subsequent tenants or owners, it necessarily follows that the tariff must be deemed to be silent on the subject as covered by the agreement, a condition which facially eliminates conflict between the agreement and the tariff.

■ The issue posed by recourse to the 1974 agreement alone as the basis for Imperial's claim against the Borgmanns presents the question of whether by private agreement Imperial may acquire rights not available generally to it against all customers under its tariff. The law is well settled that such agreements may not be made or enforced.

Section 393.140(11), RSMo 1978 grants to the Commission the power to require all utility companies to file with it all rates, rules and forms of contracts. The statute further prohibits the utility from extending to any person or corporation any form of contract or agreement except such as are regularly and uniformly extended to all persons and corporations under like circumstances. There is no showing in the present case that Imperial generally sought lien rights from customers for sewer services or that the agreement made with Howard-Money was filed with the Commission or customarily used in like circumstances. To the contrary, the thrust of Imperial's contention has been that this was a peculiar and unique situation to which a contract had been individually tailored. It therefore follows that the agreement is invalid as violative of § 393.140(11), RSMo 1978.

Consistent with this conclusion is the accepted proposition that utilities may not circumvent tariffs by contracting for an improved position on an individual basis with customers. *May Department Stores Co. v. Union Electric Light & Power Co.*, 341 Mo. 299, 107 S.W.2d 41 (1937). Were Imperial able to secure the rights to a real estate lien by negotiation of a contract with a customer, the regulatory scheme of the statutes, the purpose of the tariff and the power of the Commission to regulate would be nullified. Imperial's operations are strictly circumscribed by the tariff which, in turn, must defer to the provisions of the statutes and the general law. Because the tariff may not validly provide the lien Imperial sought to enforce against the Borgmanns, no private agreement between Imperial and Borgmanns' grantor can be effective to accomplish the same result.

In view of the disposition made of the initial points, it is unnecessary to consider whether the Commission was correct in holding that the Borgmanns were entitled to 30 days notice in advance of disconnection nor do we reach the question of reasonableness of the reconnection charge. The Borgmanns were not subject to disconnection for non-payment of charges incurred

by their predecessors in title and the Commission was correct in so holding.

The judgment is affirmed.

All concur.