**STATE of Missouri, ex rel. CAPITAL CITY WATER COMPANY, Appellant,**

v.

**MISSOURI PUBLIC SERVICE COMMISSION, Respondent,**

and

**Public Counsel for the State of Missouri, and City of Jefferson, Missouri, Intervenor–Respondents.**

No. WD 45857.

Missouri Court of Appeals, Western District.

March 2, 1993.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 27, 1993.

W.R. England, III, Brydon, Swearengen & England, P.C., Jefferson City, for appellant.

Robert J. Hack, Jefferson City, for respondent Missouri Public Service Commission.

Lewis R. Mills, Jefferson City, for intervenor-respondent Public Counsel for the State of Missouri.

Bernard Allen Garner, Jefferson City, for intervenor-respondent City of Jefferson, Missouri.

Before TURNAGE, P.J., and BRECKENRIDGE and HANNA, JJ.

BRECKENRIDGE, Judge.

Capital City Water Company (Company) appeals from an order of the circuit court affirming a decision of the Missouri Public Service Commission (Commission) in a water utility rate case. The Company claims that the circuit court erroneously affirmed the Commission's decision because: (1) the Commission is estopped from finding a contract between the Company and Public Water Supply District No. 2 of Cole County, Missouri, imprudent because of the Commission's prior approval of said contract and its actions in other rate proceedings based upon said contract; (2) the Commission's finding that the contract is imprudent is not based upon substantial and competent evidence in the record; (3) the Commission failed to consider evidence of total costs compared to total revenue over the same period of time had the Company in-

stalled its own storage facilities; and (4) the Commission's quantification of the cost of the District contract is contrary to the overwhelming weight of the evidence. The judgment of the circuit court affirming the Report and Order of the Commission is reversed.

In 1977, the Company, because of its need for storage and a backup source of water, entered into a contract with the District. Pursuant to the contract, the Company was permitted to use all of the District's storage tanks and wells. In exchange for this accommodation, the Company agreed to operate and maintain the tanks and wells; pay $2,000.00 per month to the District; and provide the District with all of the water for its customers. The contract was executed on August 23, 1977, with an effective date of June, 1978. Initially, the term of the contract was twenty years. In March, 1990, an addendum to the contract was signed, extending its term three additional years.

Before the execution of the initial contract, the Company submitted it to the Commission. In a letter from the general counsel of the Commission sent to the Company, dated August 9, 1977, it was stated that, "The proposed lease has been reviewed by this office and we have no objection to its execution." A second letter from the Commission, dated August 19, 1977, and signed by the Commission's secretary, reiterated that "[t]he proposed arrangement and lease has been reviewed by the Commission. The Commission has no objection to its execution."

Over the following twelve years, the Company filed five rate cases, each resulting in an increase in rates for the Company. Each of these rate cases was resolved by a Stipulation and Agreement on a negotiated dollar settlement. The instant case, commencing with the filing of a rate request by the Company on December 15, 1989, was the first in which the Commission reviewed the ratemaking treatment to be given the contract.

Subsequent to the Company's 1988 rate case, the Commission directed that a docket be opened to investigate the Company's demand requirements and the capacity available to meet those requirements. In Case No. WO–89–76 of its capacity docket, the Commission found that the Company would be able to provide safe and adequate service pursuant to its plan to increase its capacity through new District wells.

On December 15, 1989, the Company filed a rate request with the Commission requesting $516,477 in additional revenue. The Office of Public Counsel proposed that the request be reduced by $238,544, based upon the Public Counsel's calculation of the revenue requirement of the Company had the Company built a storage tank in 1977 measured against the revenue requirement resulting from the Company's contract with the District.[1] In its Report and Order dated November 14, 1990, the Commission adopted the Public Counsel's suggested reduction, finding the contract to be a "bad bargain." The Commission further found:

In 1977, the Company needed more water storage facilities and reviewed its only two options: building its own tanks or leasing them from the District. Company experts recommended leasing facilities if the the [sic] lease agreement contained an annual cap of 182.5 million gallons. In August, 1977, the Company entered a lease agreement for the use of three of District's tanks with a total capacity of 1.3 MG and three adjacent wells. In exchange for the use of these facilities, the Company agreed to: (1) pay the District $2,000 a month rent; (2) pay the District a monthly sum equal to the cost of water sold to the District the previous month; (2) [sic] pay for the variable costs of the water sold to the District (treatment, electricity, etc.); (3) [sic] pay for the operational and maintenance expenses of District's tanks and wells. The contract is for twenty years (1978 to 1997). It does not contain any cap. The 182.5 MG recommended cap was exceed-

---

1. The revenue requirement in the context of ratesetting is the amount of revenue ratepayers must generate to pay the costs of producing the

water received by such ratepayers while yielding a reasonable rate of return to investors.

ed by the District in 1979. Because of the unexpected growth of the District, the Company's costs under the contract have been rapidly escalating.

\* \* \* \* \* \*

The Commission is greatly concerned with Company's escalating costs under the contract. This concern is heightened by Company's failure to decrease its costs under the addendum and its agreement to incur additional costs. Thus, the Commission believes it is appropriate to examine the reasonableness of Company's rental expense by examining the contract terms which gave rise to the expense. One of the components of Company's rental expense is the amount of water used by the District. According to the terms of the contract, this is an unlimited amount. The record shows that it is an unlimited amount because Company ignored advice it received to include a 182.5 MG cap as one of the terms of the contract. The Commission finds the Company agreement to the contract without a cap against the recommendation of its own experts is unreasonable.

The contract has terms which exacerbate the absence of a cap because it required the Company to return the District's water payment. The Company has argued that this exchange of checks is a "wash" and has zero impact on the ratepayer. This Commission has rejected that argument. In the Commission's opinion, the Company's return of the District's water payment is, in effect, the provision of free water. This, combined with the absence of a cap, means Company agreed to provide an unlimited amount of free water in exchange for a fixed amount of storage.

For a fixed amount of storage, the Company agreed to provide unlimited free water *and* pay a $2000 a month rental fee *and* pay for the maintenance of the leased facilities. In the Commission's opinion, this is excessive compensation. That the Company would agree to such unequal and burdensome terms is not the concern of this Commission if

its shareholders bear the costs but when the costs of such terms fall upon the ratepayers, it is incumbent upon the Commission to act. The Commission finds it would be totally inappropriate to allow the Company to fully recover the expenses associated with the execution of this contract.

Two members of the Commission filed a dissent to the Commission's Report and Order, stating that although they believed the Company's rates needed to be adjusted to reflect the contract with the District, they found the Public Counsel's analysis of the impact on the revenue requirement questionable and suggested a rehearing to take further evidence on this issue.

The Company petitioned the Commission for a rehearing on the matter. The Commission granted the request "to take evidence on the effect on the revenue requirement of the District's contract and the revenue requirement which would have resulted had the Company installed storage facilities in 1977."

On June 19, 1991, the Commission issued its Report and Order on Rehearing. The Commission found that had the Company installed a storage tank in 1977, it would have had a revenue requirement of $148,160 in 1988. It further found that the costs related to the contract amounted to $414,169, resulting in a $266,009 adjustment to the Company's revenue requirement. After making this adjustment, the Commission found no justification for the rate increase requested by the Company and it awarded the Company no additional annual revenue.

On August 15, 1991, the Company petitioned the circuit court for a Writ of Review. The circuit court, after review of the record, found "that the Decision of the Public Service Commission in this matter is supported by competent and substantial evidence." The circuit court affirmed the Commission's decision. The Company appeals.

■ The standard for judicial review of the Commission's decisions is found in Mo. Const. art. V, § 18, which provides that "such review shall include the determina-

tion whether the same are authorized by law, and in cases in which a hearing is required by law, whether the same are supported by competent and substantial evidence upon the whole record." Review is of the decision of the Commission, not the judgment of the circuit court. *State ex rel. Marco Sales, Inc. v. Pub. Serv. Comm'n,* 685 S.W.2d 216, 218 (Mo.App.1984).

▮ Judicial review is limited to a determination of whether the Commission's order was lawful and reasonable. *State ex rel. Conner v. Pub. Serv. Comm'n,* 703 S.W.2d 577, 579 (Mo.App.1986). "Questions of 'lawfulness' turn on whether the Commission's orders or decisions are statutorily authorized and questions of 'reasonableness' turn on whether there is competent and substantial evidence upon the whole record to support them." *Id.* The reviewing court addresses legal issues anew, but factual issues decided by the Commission are presumed correct until the contrary is shown. *Office of Public Counsel v. P.S.C.,* 782 S.W.2d 822, 824 (Mo.App. 1990). A strong presumption in favor of the validity of the conclusions of an experienced administrative body exists in ratemaking proceedings. *Smith v. Pub. Serv. Comm'n,* 351 S.W.2d 768, 771 (Mo.1961). The party seeking to set aside the order of the Commission bears the burden of proof in demonstrating, by clear and satisfactory evidence, that the challenged order is unlawful or unreasonable. Section 386.430, RSMo 1986.[2]

In its first point, the Company argues that the Commission was equitably estopped and barred by laches from finding the contract "imprudent" based upon its earlier actions, specifically by (1) approving the contract prior to its execution, as evidenced by letters from the general counsel and secretary of the Commission; (2) allowing stipulated rate increases in five rate cases in the twelve years between the execution of the contract and the filing of the proceeding now at issue; and (3) finding, during an investigation in 1988, that the Company would be able to provide safe and adequate service pursuant to its plan to increase capacity through the expansion of District storage facilities.

▮ The Office of Public Counsel, a respondent in this appeal, argues that the Company did not properly preserve the issues in Point I for review because they were not set forth in the Company's application for rehearing as required by § 386.-500. The Office of Public Counsel is correct in its argument that the Company did not set forth its claim of laches in its application for rehearing. As a result, laches has not been preserved for appeal and this court will not address it. *State ex rel. Intern. Telecharge v. Pub. Serv. Comm'n,* 806 S.W.2d 680, 687 (Mo.App.1991). The Company did, however, raise "collateral" estoppel in both its initial application for rehearing on November 13, 1990 and its second application for rehearing filed on July 1, 1991. The Company argues in both applications that the Commission was collaterally estopped from examining the issue because it approved the contract prior to its execution and could have reviewed the contract in any of the five previous rate cases or during the capacity case. The Company has argued the issue of equitable estoppel even though under the misnomer of collateral estoppel. Because the Company raised equitable estoppel arguments, it has preserved the issue for review. *See State ex rel. Chicago, Rock Island & Pac. R. Co. v. Pub. Serv. Comm'n,* 441 S.W.2d 742, 748 (Mo.App.1969).

The Company relies upon three separate bases for estoppel. It argues that although any single aspect might not have provided the grounds for an estoppel, all three, considered together, provide a clear basis for reasonable reliance by the Company, and that the Commission should be estopped from denying these actions now.

The Company apparently sent a copy of the proposed contract to the Commission in 1977, before said contract was executed. This action on the part of the Company may be inferred from the content of the letters sent by the general counsel and the secretary of the Commission to the Compa-

2. All statutory citations are to Revised Missouri Statutes 1986, unless otherwise stated.

ny, wherein it was stated that the Commission did not object to the execution of the contract. The letters did not express an opinion as to the wisdom of the contract terms, specify the future treatment of the contract for ratesetting purposes, or refer to any of the specific contract provisions.

Five rate cases were subsequently filed by the Company. In each case a rate increase resulted from a stipulated settlement. The contract was never specifically addressed in these rate cases. In all five cases, the settlement agreement contained language specifying that neither the Commission nor any other party was bound in future proceedings by any principle of law or ratemaking contained in the agreement. The Company also directs attention to the determination made by the Commission in Case No. WO–89–76 of its capacity docket that the Company's capacity, including the District wells and storage, was sufficient to provide safe and adequate service.

Equitable estoppel is normally not applicable against a governmental entity. *Farmers' & Laborers' v. Dir. of Revenue*, 742 S.W.2d 141, 143 (Mo. banc 1987). The application of equitable estoppel against governmental entities or public officers is limited to exceptional circumstances where right or justice or the prevention of manifest injustice requires its application. *Murrell v. Wolff*, 408 S.W.2d 842, 851 (Mo.1966); *State ex rel. Letz v. Riley*, 559 S.W.2d 631, 634 (Mo.App.1977). Honesty and fair dealing must require that equitable estoppel be applied in order to prevent manifest injustice. *Murrell*, 408 S.W.2d at 851. The doctrine is not favored by law and is not to be casually invoked. *State, Etc. v. City of Woodson Terrace*, 599 S.W.2d 529, 531 (Mo.App.1980). Equitable estoppel cannot be applied if it will prejudicially affect the sovereignty of the state. P.H. Vartanian, Annotation, *Applicability of Doctrine of Estoppel Against Government and its Governmental Agencies*, 1 A.L.R.2d 338, 340–41 (1948). As a result, equitable estoppel is not applicable if it will interfere with the proper discharge of governmental duties, curtail the exercise of the state's police power or thwart public

policy. *Id.* at 341. The underlying principle behind its limited application to governmental entities and public officials is that public rights should yield only if private parties possess greater equitable rights. *Riley*, 559 S.W.2d at 634.

Equitable estoppel has three elements: (1) an admission, statement or act inconsistent to a claim afterwards asserted; (2) action by the other party in reliance upon such admission, statement or act; and (3) injury to that other party as a result of allowing the first party to contradict the admission, statement or act. *Van Kampen v. Kauffman*, 685 S.W.2d 619, 625 (Mo.App.1985). In an estoppel claim against the government, these three elements must be satisfied in addition to showing that the governmental action on which the claim is based constitutes affirmative misconduct. *Farmers' & Laborers'*, 742 S.W.2d at 143. The party claiming estoppel has the burden of proof and every fact creating the estoppel must be established by clear and satisfactory evidence. *Van Kampen*, 685 S.W.2d at 625.

In the instant case, the focus of the inquiry into the application of estoppel must necessarily be the letters from the Commission sent to the Company before the contract was executed. The Company cannot rely upon the five intervening rate cases or the Commission's investigation of the Company's capacity, as these actions induced no reliance on the part of the Company; the contract with the District was already in existence at the time said acts occurred.

It is unnecessary for the court to decide whether the Company has proved the elements of estoppel because upon examination of the letters, it is apparent that the statements made therein, when combined with the facts of the instant case, do not rise to the level of "exceptional circumstances." Application of the doctrine of equitable estoppel is unnecessary in this case to prevent manifest injustice. The private rights of the Company must outweigh the public rights of the ratepayers in order to equitably estop the Commission. Such a situation does not exist. The Com-

mission has broad discretion to set just and reasonable rates and it has not exceeded that discretion in the instant case. *State ex rel. Util. Consumers Council, Etc. v. Pub. Serv. Comm'n,* 585 S.W.2d 41, 49 (Mo. banc 1979).

As a governmental entity, the Commission's powers are an extension of the state's sovereignty.. *State ex rel. Chicago, Rock Island & Pacific Railroad Co. v. Pub. Serv. Comm'n,* 312 S.W.2d 791, 796 (Mo. banc 1958). It is well-established in Missouri that the Commission has the primary authority to regulate rates. *May Dept. Stores Co. v. Union Electric L. & P. Co.,* 341 Mo. 299, 107 S.W.2d 41, 50 (1937). The Commission's principal interest is to serve and protect ratepayers, *State ex rel. Crown Coach Co. v. Pub. Serv. Comm'n,* 238 Mo.App. 287, 179 S.W.2d 123, 126 (1944), and as a result, the Commission cannot commit itself to a position that, because of varying conditions and occurrences over time, may require adjustment to protect the ratepayers, *State ex rel. Chicago, Rock Island & Pacific Railroad Co.,* 312 S.W.2d at 796. The Commission requires flexibility in exercising its rate-making function to deal with changing and unforeseen circumstances. *Id.* As a result, contracts between public utilities and their customers cannot limit the ratemaking authority of the Commission. *May Dept. Stores Co.,* 107 S.W.2d at 49; *State ex rel. Imperial Utility v. Borgmann,* 664 S.W.2d 215, 219 (Mo.App.1983). Public utilities have no authority to enter into a contract which cannot be modified or revoked by the state. 64 Am.Jur.2d *Public Utilities* § 81 (1972).

Missouri case law provides guidance as to what is required to constitute exceptional circumstances and manifest injustice. The Missouri Supreme Court found no evidence that manifest injustice would result in *Lynn v. Director of Revenue,* 689 S.W.2d 45, 49 (Mo. banc 1985), if equitable estoppel were not applied. In *Lynn,* a taxpayer owned an excursion-sightseeing business on the Missouri River and was initially advised in 1967, and again in 1976, by Department of Revenue employees that

his operation was exempt from sales taxes on admission fees. The taxpayer attempted to argue, when he was later audited and assessed sales tax, that the statements of the Department of Revenue employees were a basis for asserting equitable estoppel against the Department. *Id.* at 48. The court held that the facts of *Lynn* did not rise to the level of manifest injustice. *Id.* at 49. In *Coalition to Preserve Ed. v. K.C. Sch. Dist.,* 649 S.W.2d 533, 539 (Mo. App.1983), the lower court found that no valid, binding contract existed between the Coalition to Preserve Education and the School District of Kansas City for opening an experimental school. On appeal, the Coalition argued that the District should be equitably estopped from denying the validity of the contract because manifest injustice would result since the Coalition had already performed its obligations under the contract. *Id.* The court upheld the District's determination that the money would be better invested in other endeavors as the exercise of its right to make such decisions and found that no manifest injustice resulted, even considering the Coalition's· reliance. *Id.* These cases illustrate the difficulty of meeting the standard of manifest injustice. The instant case does not meet that standard. Point I is denied.

The remaining points raised by the Company focus on the Commission's finding that the contract is imprudent. The Commission has the ability to inquire into the reasonableness of a transaction between a utility and another when the transaction impacts the utility's operating costs included in the company's rate base. *See State ex rel. Gen. Tel. Co. v. Pub. Serv. Comm'n,* 537 S.W.2d 655, 664 (Mo. App.1976). The Commission's power and duty to inquire into the reasonableness of the transaction in question includes the right to determine a reasonable standard of judgment consistent with statutory and constitutional limitations. *Id.* The Commission adopted the "reasonable care standard" from *Re: Union Electric Company,* 27 Mo.P.S.C. (N.S.) 183, 194 (1985), as the standard in the case at hand for evaluating the prudence of the Company's contract.

The "reasonable care standard" was described by the Commission in *Re: Union Electric Company*, 27 Mo.P.S.C. (N.S.) at 194, as follows: "The Commission will assess management decisions at the time they are made and ask the question, 'Given all the surrounding circumstances existing at the time, did management use due diligence to address all relevant factors and information known or available to it when it assessed the situation?' "

The Company takes exception to the Commission's treatment of the contract on three separate grounds, first objecting to the Commission's characterization of the contract as unreasonable because of the lack of a "cap" on the amount of water provided to the District. The Company also challenges the time frame the Commission used to examine the contract, claiming that the Commission erred in not looking at the total costs to date and comparing these costs to the revenue requirement to date which would have resulted had the Company installed its own storage facilities in 1977. Finally, the Company claims that the Commission erred in quantifying the costs of the contract.

The Commission's Report and Order carries with it a presumption of validity. *State ex rel. Missouri Power & Light Co. v. Pub. Serv. Comm'n*, 669 S.W.2d 941, 944 (Mo.App.1984). Although this court may not substitute its judgment for that of the Commission, it is allowed to determine whether, upon consideration of the evidence, the Commission could reasonably have reached the result that it did. *Id.* Reversal is warranted where the action of the Commission was arbitrary, capricious and without reasonable basis. *Id.*

In its second point, the Company initially argues that the Commission's finding that the contract between the Company and the District was imprudent is not supported by competent and substantial evidence because the Commission granted a rehearing concerning its quantification of the monetary impact of the imprudent contract. The Company relies upon *State Highway Commission v. Pub. Serv. Comm'n*, 459 S.W.2d 736, 739 (Mo.App.

1970), which holds that, upon a rehearing, the case before the Commission stands as if it had not previously been heard. The Company claims that the findings with regard to the quantification of the revenue requirement are an essential component of the determination that the contract was imprudent; that the Commission's grant of a rehearing eliminated the evidentiary basis for the determination of imprudency.

Under § 386.500.1, rehearing may be granted on the order in its entirety or on any matter contained in the order. Upon rehearing, if the Commission determines its original order to be in any part unjust, unwarranted or in need of change, then the Commission may abrogate, change or modify the original order or decision. Section 386.500.4. The order on rehearing does not affect any portion of the original order not abrogated, changed or modified by the order on rehearing. Section 386.-500.4. The rehearing requested by the Company was granted only to take additional evidence to ascertain the dollar figure adjustments to the Company's rates resulting from the Commission's determination that the contract was imprudent. The grant of the rehearing did not alter the Commission's determination of imprudency.

In Point II, the Company next argues that such finding of imprudency by the Commission was unreasonable. The Commission determined that it was imprudent for the Company, in exchange for a limited amount of storage capacity from the District, to agree to provide a potentially unlimited quantity of water to the District, plus pay $2000 per month and agree to assume operation and maintenance of the District facilities. The Commission found that if the Company desired to enter into a contract with the District rather than construct its own storage facilities, the Company should have negotiated a definite cost for leasing District facilities and should have charged the District for water usage. If the company had installed its own storage facility in 1977, the revenue impact for the test year would have been $148,160. The revenue impact in the test

year of supplying water to the District under the contract was $414,169.

■ In reviewing the reasonableness of the Commission's findings under the "reasonable care standard," circumstances are considered as they existed at the time the contract with the District was executed. While this rate case was pending, the Company was asked for all documents that supported the signing of the 1977 contract. The only document filed was a study prepared by the Company which compared the cost of building a storage tank to the cost of renting storage from the District. The study recommended that as compensation for the rental of District storage facilities, the Company should not provide water to the District in excess of 182.5 million gallons per year and that the District should pay for any water usage in excess of that amount. Nevertheless, the language of the contract as executed obligated the Company to meet all the water needs of the District, without limit, for a period of twenty years.

Management of the Company knew at the time they executed the contract that the Company was receiving a finite amount of storage while committing to provide an infinite amount of water to the District. As the District's needs grow, the Company would be obligated to provide water to meet those needs. When water production increases, water production costs increase. By signing the contract, they created unlimited liability for events over which the Company has absolutely no control. Even knowing that the Commission did not object to the execution of the contract, management did not adhere to the reasonable care standard by failing to follow the recommendations of the Company's own study and exposing the Company to unlimited future liability. Competent and substantial evidence supports the Commission's finding that the contract was imprudent. Point II is denied.

■ The Company's next point claims the Commission erred in not considering the total cost to date of the District contract compared to the revenue requirement to date had the Company installed its own

storage facilities in 1977. The Commission made its assessment of the contract as imprudent using a single year. The Commission rejected the Company's incremental costing methodology. In its Report and Order, the Commission found that in providing water to the District, the Company incurred costs, "both directly assignable and allocated as well as fixed and variable," which should be reflected in the rates.

The premise for the Company's argument is that the first twelve years of the District contract produced a net savings to ratepayers when comparing the cumulative costs of the District contract to the cumulative revenue requirements of the installation of storage facilities. The Company's calculations for such savings are based upon a comparison between the revenue requirements of building storage facilities and the cost of chemicals, purchased power and deferred maintenance incurred in supplying water to the District under the lease. The Commission found that there were other costs to the Company in addition to these incremental costs. Therefore, the calculations relied upon by the Company to show a net savings were inaccurate because the figures utilized underestimate the costs of the District contract. When the Company's calculations were rejected, the Company failed to prove its premise that there was a net savings over the term of the contract. There are no grounds for error in the Commission's reliance on the data from the test year, rather than reliance on the Company's inaccurate computations. Point III is denied.

■ The Company's last point challenges the Commission's quantification of the costs associated with the contract. The contract with the District allowed the Company use of the District's water storage tanks and wells in exchange for the Company's maintenance of those tanks and wells, payment to the District of $2000 per month and providing the District with the water it required for its customers. For billing purposes, the contract provided for the Company to send the District a monthly bill for the water the District used, multiplying the amount used by Rate E in the Company's

tariff. The District would then send a check to the Company which the Company returned to the District. For accounting purposes the revenue and expense associated with the contract provide a wash.

In its Order on rehearing, the Commission stated:

Providing water to District customers causes some costs, both directly assignable and allocated as well as fixed and variable, to CCWC. Those costs should be reflected in rates. The rates would include the cost of the contract, which should have been a certain amount rather than an undetermined, escalating amount based upon District's water usage. The only rate available in CCWC's tariffs and the one used to monitor District's water usage is Rate E. This is also the rate used to recover the costs of water used by District above the contract cap.[3] These rates recover a portion of the cost of service of CCWC and have been found to be just and reasonable by the Commission.

Generally, when a customer or group of customers pays less for a good or service than it costs to provide such good or service, the customer or group is receiving a subsidy. The value to the Company of the use of the District's wells and storage facilities is $148,160.[4] The cost of supplying water to the District during the test year exceeds this figure. Therefore, the District is paying less for the water it receives from the Company than it costs the Company to provide such water. The effect of the contract is that the Company's ratepayers are providing a subsidy to the District. Company ratepayers should pay for the benefit of the additional storage needed to provide reliable service, but they should not pay an excessive amount for such storage. In deciding whether to grant the rate increase requested by the Company, the Commission acted to protect the ratepayers from the impact of the imprudent contract by reducing the Company's revenue requirement by the amount it calculated that the cost of providing water to the District exceeded the reasonable cost of alternative storage.

The Commission's approach to ascertaining the costs resulting from the imprudent contract contains two implicit assumptions: (1) that the tariff rate charged for the water is reasonably comparable to the cost of the water provided the District; and (2) that because the Commission found that the District would remain a customer of the Company had the contract not been executed, it is reasonable to include in the cost of supplying water to the District the return on investment included in the tariff rate. The record reveals that logically, these assumptions are flawed and the Commission's decision is likewise flawed.

In *State ex rel. City of Lake Lotawana v. Pub. Serv. Comm'n*, 732 S.W.2d 191, 195 (Mo.App.1987), this court acknowledged the deference paid to the expertise of the Commission and the heavy burden born by those who would challenge the Commission's orders. As a caveat, the court stated: "But if judicial review is to have any meaning, it is a minimum requirement that the evidence, along with the explanation thereof by the witnesses and by the Commission itself, make sense to the reviewing court. We may not approve an order on faith in the Commission's expertise." *Id.* The Commission's quantification of the contract in this case simply does not make sense.

Tariff E is the Company's rate for manufacturers and large quantity users of water whose use is not less than 60,000 cubic feet

---

**3.** The contract provides for one situation in which the District must pay at the Rate E tariff in excess of a yearly calculated growth cap to account for months when abnormally high usage occurs.

**4.** The Company argues that the Commission ignored the value of the District wells as a backup source of water for emergencies. There was evidence, however, that the Company currently has an emergency interconnection with Public Water District # 1 at the west edge of the Company's service and that a similar interconnection would be appropriate with the District in absence of the lease. Since such an arrangement would be mutually beneficial to both water companies, the evidence was that there is normally no charge for such arrangement other than the cost of water actually supplied.

of water per month. The Commission found that the parties utilized Rate E to calculate the water used by the District. The Commission determined the cost of the lease to be $414,171, which it computed by multiplying the number of gallons of water the District used times the tariff Rate E. Since Missouri Public Service Commission tariffs are based on the cost of service to provide a customer with water, it would generally be presumed that the cost of providing water to the District was equal to tariff E. Under the circumstances of the contract, however, the assumption that Rate E reflects the costs associated with the Company's provision of water to the District is not logical. The District is not purchasing water as a typical customer of the Company. Nearly one-half of the water supplied to the District comes from its own tanks and wells. Costs associated with providing the District with water from its own facilities would logically be less than if the Company provided water to the District from Company facilities.

Commissioner Rauch recognized the difference in his dissent on the Commission's Report and Order, after rehearing. Troubled by the value assigned to the water, Commissioner Rauch stated:

> It is my conclusion that the District is, in part, a typical customer of the Company and, in part, it is not. The District receives water from the Company which is, in fact, acquired from two different sources. One source is the Company's treatment plant and the other is the District's wells. I believe the water provided the District need not be and should not be valued as if the District were a typical Rate E customer. The water provided the District should be valued differently on its source and related costs.

Included in the calculation of Rate E is wear and tear on the facility utilized, i.e., depreciation. By applying Rate E to the water supplied from the District's own facilities, the Commission would be reducing the revenue requirement for costs assessed to the imprudent contract when the Company is not actually incurring such costs. Although there is a legitimate basis for assessing depreciation on the Company facilities as a cost of the water supplied from such facilities, there is no legitimate basis to assess a cost of depreciation for the water supplied from the District's own facilities.

Rate E also includes a return on investment or profit to the Company. The Commission's valuation of the water at Rate E is made upon the assumption that the District would be a customer of the Company who would pay Rate E if the Company had demanded more favorable contract terms in 1977. Hypothetical contract terms which might have been negotiated are irrelevant in the present matter before the Commission. The responsibility of the Commission is to protect the ratepayers from subsidizing the District. Return on investment is not an actual cost which the ratepayers were incurring under the imprudent contract. It is unreasonable to include return on investment when computing the cost of the lease to the ratepayers.

The Commission utilized Rate E because it found it was without other evidence to establish a reasonable rate for water service to the District. The Commission had evidence sufficient to adjust Rate E for application in the present case. Depreciation costs and return on investment were incorporated into Rate E. Evidence of the computation of the existing tariff Rate E and the Company's proposed increase contained a breakdown of the costs of depreciation and specified the rate of return. The Commission's intention in establishing the appropriate revenue requirement for setting rates was that the Company's shareholders not be permitted to recover from ratepayers the expenses associated with the imprudent contract. It is reasonable to exclude only those expenses actually incurred. Although Rate E is a valid basis for computing the cost of supplying water generally, it was unreasonable for the Commission to utilize Rate E when valuing the water supplied to the District without adjusting the rate to exclude depreciation applicable to the water supplied from the District's own facilities and to exclude a return on investment on all water supplied.

Accordingly, the judgment affirming the Report and Order of the Public Service Commission is reversed and the cause remanded to the Circuit Court with directions to remand this cause to the Commission for further proceedings consistent with this opinion.

All concur.